**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JOHN CHAMBERLAIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) **CIVIL ACTION NO. 08-13451 (PDB)** ) |
| REDDY ICE HOLDINGS, INC., WILLIAM P. BRICK, STEVEN J. JANUSEK, JIMMY C. WEAVER, and RAYMOND D. BOOTH, | ) **CLASS ACTION** ) ) ) ) |
| Defendants. | ) ) **JURY TRIAL DEMANDED** ) |

**LEAD PLAINTIFFS' BRIEF IN OPPOSITION TO THE MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT FILED BY
DEFENDANT JIMMY C. WEAVER**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ...................................................................1

II.   STATEMENT OF FACTS....................................................................... 2

III.  ARGUMENT AND AUTHORITIES .................................................... 6

      A.    Plaintiffs Sufficiently Allege Weaver's Scienter ........................... 6

      B.    Plaintiffs' Sufficiently Allege A Section 20(a) Claim
            Against Weaver .......................................................................13

      C.    Plaintiffs Sufficiently Demonstrate Loss Causation ...................13

IV.   CONCLUSION.....................................................................................16

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*In re Accredo Health, Inc. Sec. Litig.,*
   2005 U.S. Dist. LEXIS 46923 (W.D. Tenn. Apr. 11, 2005) ................................ 8

*In re Aetna Inc. Sec. Litig.,*
34 F. Supp. 2d 935 (E.D. Pa. 1999)..............................………..9

*In re Bradley Pharms., Inc., Sec. Litig.,*
   421 F. Supp. 2d 822 (D.N.J. 2006).............................................................15, 16

*Brown v. Earthboard Sports USA, Inc.,*
   481 F.3d 901 (6th Cir. 2007).................................................................... 13

*Brumbaugh v. Wave Sys. Corp.,*
   416 F. Supp. 2d 239 (D. Mass. 2006) ..................................................... 16

*In re Cardinal Health Inc. Sec. Litig.,*
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ......................................................passim

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,*
   497 F.3d 546 (5th Cir. 2007)................................................................. 11

*In re Daou Sys.,*
   411 F.3d 1006 (9th Cir. 2005)..................................................................13, 15

*Dura Pharms., Inc., v. Broudo,*
   544 U.S. 336 (2005)................................................................................13, 16

*In re FirstEnergy Corp. Sec. Litig.,*
   316 F. Supp. 2d 581 (S.D. Ohio 2004), 316 F. Supp. 2d......................................... 9

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,*
   270 F.3d 645, 661 (8th Cir. 2001) .................................................... 12

*Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.,*
   2005 U.S. Dist. LEXIS 376 (N.D. Ill. 2005)......................................... 16

*Helwig v.Vencor, Inc.,*
   251 F.3d 549 (6th Cir.) (en banc) ), *cert. denied,* 536 U.S. 935 (2002) ........................... 6, 13

*Higginbotham v. Baxter Int'l, Inc.,*
   495 F.3d 753 (7th Cir. 2007)................................................................ 8

*Keithley Instruments, Inc. Sec. Litig.*,
    268 F. Supp 2d 887 (N.D. Ohio 2002) ................................................................. 8

*In re Lason, Inc. Sec. Litig.*,
    143 F.Supp.2d 855 (E.D. Mich. 2001) ............................................................... 10

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) ............................................................................... 8

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. Ill. 2008) ......................................................................... 8

*In re Marsh & McLennan Co. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................................. 7

*Menkes v. Stolt-Nielsen S.A.*,
    No. 3:03CV409, 2006 U.S. Dist. LEXIS 42644 (D. Conn. Jun. 19, 2006) ........... 7

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................ 10

*Mississippi Public Employees Retirement Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008) ................................................................................ 11

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
    320 F. 3d 920 ...................................................................................................... 12

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ...................................................................... 7

*Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*,
    221 F.3d 913 (6th Cir. 2000) ............................................................................... 8

*Ross v. Abercrombie & Fitch Co.*,
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) ............................................................ 14

*Rothman v. Gregor*,
    220 F.3d 81, 94 (2d Cir. 2000) .......................................................................... 11

*Sanders Confectionary Prods. v. Heller Fin., Inc.*,
    973 F.2d 474 (6th Cir. 1992) ............................................................................. 13

*In re St. Paul Travelers Sec. Litig.*,
    2006 WL 2735221 (D. Minn. Sept. 25, 2006) ..................................................... 7

*In re SmarTalk Sec. Litig.*,

124 F. Supp. 2d 527 (S.D. Ohio 2000) ................................................................ 13

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    No. 00 Civ. 1041, 2000 U.S. Dist. LEXIS 12504 (S.D.N.Y. Aug. 31, 2000)......................... 7

*Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000) ........................................................... 11

*In re UnumProvident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ............................................................ 7

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) ............................................................................... 1

§ 20(a) of the Securities and Exchange Act of 1934 ...................................... 1, 13

## RULES

Rule 10b-5 ................................................................................................ 1

Rule 10b5-1 ............................................................................................ 11

Lead Plaintiffs, Lawrence Diamond and Southeastern Pennsylvania Transportation Authority ("Plaintiffs") respectfully submit this Brief in Opposition to the Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint") and supporting brief filed by Defendant Jimmy C. Weaver ("Weaver Mem."), [Dkt. No. 42], and in further support of Plaintiffs' opposition to the Brief in Support of the Motion to Dismiss filed by Defendants Reddy Ice Holdings, Inc. ("Reddy Ice"), William Brick and Steven Janusek ("Def. Mem.") [Dkt. No. 43].

## I.    PRELIMINARY STATEMENT

In his Motion to Dismiss [Dkt. No. 41], Defendant Jimmy Weaver ("Weaver") seeks to dismiss Plaintiffs' claims for violation of Section 10(b) and Rule 10b-5 and Section 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") based primarily upon three grounds. First, Weaver erroneously suggests that Plaintiffs have failed to plead facts with the particularity required by the Private Securities Litigation Reform Act (the "PSLRA"). In support of this argument, Weaver adopts the arguments of defendants Reddy Ice, Brick and Janusek in their motion to dismiss the Complaint and supporting brief.

As set forth in Plaintiffs' brief in opposition to the motion to dismiss the Complaint filed by defendants Reddy Ice, Brick and Janusek, which is filed contemporaneously herewith and incorporated herein by reference, Plaintiffs allege in detail numerous materially false statements and omissions and demonstrate a duty for Defendants to disclose their illegal anticompetitive agreements. Plaintiffs state with particularity the reasons those statements are false and misleading, and the facts on which the allegations are based.[1]  15 U.S.C. §78u-4(b)(1).  Finally, Plaintiffs more than adequately allege pervasive anticompetitive activity within Reddy Ice and that Reddy Ice deceived the investing public by stating that its success and dominant market

---

[1] "Defendants" collectively refers to Weaver, Reddy Ice, William Brick ("Brick"), the Company's President, Chief Executive Officer ("CEO"), and Executive Chairman of the Board of Directors; Steven Janusek ("Janusek") the Company's Chief Financial Officer ("CFO") and an Executive Vice President; and Defendant Raymond D. Booth ("Booth") the Company's Chief Operating Officer ("COO") during all relevant times until January 2008. ¶¶ 29-32.

1

position was achieved in a lawful competitive environment, when in fact it was not. *See, e.g.*, ¶¶ 68-72, 75, 77-78, 81-84, 86-88, 106. [2] Plaintiffs also attribute materially false statements and omission to Weaver through SEC filings that he signed and certified. These allegations more than sufficiently plead actionable securities fraud claims against Weaver.

Second, Weaver attacks the Complaint, which is replete with facts and circumstances demonstrating Defendants' knowing and reckless conduct, as insufficiently alleging a strong inference of Weaver's scienter. Plaintiffs' allegations, however, demonstrate that Weaver and the other Defendants knowingly and recklessly disregarded obvious risks that their anticompetitive conduct was illegal and issued materially false and misleading statements that had a direct nexus to such conduct. Plaintiffs further allege with specificity that Weaver stood to and did personally gain from his recklessness and fraud through lucrative insider sales during the Class Period while Reddy Ice's stock was trading at all-time high prices.

Finally, Weaver argues that Plaintiffs have not adequately alleged loss causation from facts demonstrating that Reddy Ice's stock price plummeted when news of Defendants' participation in an illegal market allocation scheme in the packaged ice industry was revealed to investors. Plaintiffs' allegations show that Plaintiffs suffered an economic loss after the truth behind Defendants' Class Period misrepresentations were disclosed to the market, which is more than demonstrate loss causation sufficient to plead violations of the Exchange Act. Accordingly, Defendant Weaver's motion to dismiss Plaintiffs' Complaint should be denied in its entirety.

## II.    STATEMENT OF FACTS

Reddy Ice, the nation's largest packaged ice manufacturer, is a target of numerous federal investigations and civil lawsuits arising out of an illegal conspiracy to allocate territories and customers to raise, fix, maintain or stabilize packaged ice prices. ¶¶ 6, 44, 61. Throughout the

---

[2]    All references to "¶" refer to the Consolidated Class Action Complaint (the Complaint"). [Dkt. No. 37.]

Class Period, Defendant Weaver was a high-ranking executive, holding at various times positions as Reddy Ice's President, Chief Operating Officer and Chief Executive Officer. Weaver signed numerous Company SEC filings and certified as true and accurate the information contained therein. *See, e.g.*, ¶¶ 37, 66, 93, 107, 116, 119. Defendant Weaver, along with the other Defendants, profited from the Company's professed ability to grow revenues and successfully gain market share and compete in the "highly competitive" packaged ice industry. ¶¶ 172, 176.[3]

While touting Reddy Ice as a dominant player in the U.S. that was minimally impacted by competition in its primary geographic territories, defendant Weaver and the other Defendants knowingly and recklessly omitted material information regarding unlawful deceptive agreements that the Company entered into in violation of U.S. antitrust laws. ¶¶ 5, 42. Indeed, unbeknownst to investors, prior to and continuing throughout the Class Period, Reddy Ice was involved in an unlawful anti-competitive conspiracy involving two of its largest competitors, Arctic Glacier, Inc., based in Winnipeg, Canada ("Arctic Glacier"), and Home City Ice Co., based in Cincinnati Ohio ("Home City"). ¶¶ 6, 43. Together, Reddy Ice, Arctic Glacier and Home City formed a cartel to suppress and eliminate competition by allocating the U.S. market for packaged ice and entering into secret agreements not to compete among themselves in certain geographic markets. *Id.*

Notwithstanding this knowledge of the illegal market allocation agreement, Weaver authorized the disclosure of numerous false and misleading statements during the Class Period. Beginning with Reddy Ice's initial public offering ("IPO") on August 10, 2005, which also is the

---

[3]     At the time of Reddy Ice's Initial Public Offering in August 2005, Defendant Weaver was the Company's President, Chief Operating Officer ("COO") and a director on the Company's Board of Directors. *See* Prospectus, filed with the SEC on May 24, 2006, and attached to the Declaration of Lauren Wagner Pederson, Ex. 2, at 65-66. Prior to the IPO, Weaver had been an executive at Reddy Ice's predecessor, holding the COO and President positions and becoming a Board member in 2002. *Id.* Weaver also served as Reddy Ice's President and CEO from May 17, 2007 until December 1, 2007 when he resigned. ¶ 31.

start of the Class Period, defendant Weaver, as President and Chief Operating Officer, together with the defendants Brick and Janusek signed and authorized the issuance of the Company's Registration Statement and Prospectus touting the Company's dominant market position and competitive advantages, without disclosing any anticompetitive practices or agreements. ¶¶ 37, 66-72. Further, in May 2006, Weaver signed the Registration Statement and Prospectus for a follow-on Secondary Public Offering (the "Secondary Offering"). ¶ 93. Like the IPO, the Secondary Offering documents contained numerous statements regarding the Company's market share and ability to successfully compete in the purportedly "highly competitive" packaged ice industry, while failing to disclose that the Company's success was highly dependent on an unlawful market allocation agreement. ¶ 94.

Additionally, in his role as President and Chief Operating Officer, Weaver signed the Company's Annual Report on SEC Form 10-K for 2005 (¶ 80), and as President and Chief Executive Officer, Weaver signed Reddy Ice's Annual Report on SEC Form 10-K for 2006 and accompanying Certificate of Compliance with Sarbanes-Oxley (¶ 107, 114). Weaver also signed the Company's Quarterly Reports on Form 10-Q (together with the accompanying Sarbanes-Oxley certificates) for the Company's second and third quarter of 2007 operating results. ¶¶ 116, 119. Each of these disclosures authorized by Weaver contained false and misleading statements and omissions regarding Reddy Ice's market share and its ability to dominate the packaged ice industry through its purported competitive advantages. ¶¶ 85, 110, 117, 121.

Defendant Weaver's knowing participation in the unlawful market allocation scheme is demonstrated by, *inter alia*, statements he made regarding the illegal market allocation to CW2 in the presence of defendant Janusek at a manager's meeting held in Dallas, Texas (the Company's hometown) in February of either 2006 or 2007. ¶¶ 51-52.

Additionally, Weaver was able to profit handsomely by conducting business in accord with the unlawful market allocation agreement. In the IPO, defendant Weaver together with other selling shareholders collectively received $56.5 million in proceeds from the sale of Reddy

Ice shares in the IPO.  ¶ 37, 66.   In the May 2006 Secondary Offering, Reddy Ice and its controlling shareholders, including defendant Weaver, sold an additional 4.59 million shares of the Company's common stock to investors at $21.55 per share, generating $98.9 million in proceeds that were paid to the controlling shareholders.  ¶ 96.   Further, throughout the Class Period, Weaver sold over 84,000 shares of Company stock, or 33% of his total holdings, for gross proceeds totaling over $1.8 million.   ¶ 170.   It also bears mentioning that defendants Weaver and Raymond D. Booth, Reddy Ice's Chief Operating Officer who assumed the position when Weaver was promoted to CEO, each sold large blocks of shares of Reddy Ice stock on the exact same day on two separate occasions during the Class Period.  ¶ 170.

Together with these stock sales, defendant Weaver was also rewarded with a lucrative executive compensation package based upon the Company's success that was achieved in large part as a result of Weaver's knowing participation in an illegal collusive market allocation agreement with purported packaged ice competitors.  Indeed, Weaver almost doubled his base salary and cash bonus of $1,336,143 through the award of "incentive stock awards" totaling $1,199,852.  ¶¶ 172-173.

Further, during July 2007, Weaver and the other Defendants actively pursued a merger with GSO Capital Partners, L.P. ("GSO"), a hedge fund through which the Company was to be taken private in a transaction that paid shareholders $31.25 per share, which was a premium of approximately 9.6% over the Company's closing share price of $28.52 on June 29, 2007.  ¶ 8, 9, 175.  Defendant Weaver and the other Defendants stood to reap a total of $6.375 million for their Reddy Ice holdings, including restricted stock, which vested immediately if the merger was closed.  Although the transaction was expected to close in the fourth quarter of 2007, on January 31, 2008, the Company announced that the merger had been abandoned.  Thus, Weaver was unable to reap an additional $1,875,000 from the immediate vesting of Restricted Share Units. ¶ 176.

On the heels of this announcement, Weaver's ability to continue to profit from the unlawful market allocation agreement began to unravel in March 2008 when the Company disclosed that it had been raided by the FBI in connection with an investigation by the Antitrust Division of the United States Department of Justice (the "DOJ") in March 2008.  ¶¶ 126-128. Indeed, after months of denying awareness of any illegal anticompetitive conduct, Reddy Ice subsequently admitted in September 2008 that its Executive Vice President of Sales & Marketing, Ben Key, had been terminated for violating Company policies in connection with the matters under investigation by the DOJ.  ¶¶ 14, 151.  As expected, the market punished Reddy Ice's shares, closing after the end of the Class Period on September 15, 2008 at $6.75 and continuing to tumble during the following days to $3.43, which was but a fraction of its IPO price. ¶¶ 19, 152.

## III.    ARGUMENT AND AUTHORITIES

### A.     Plaintiffs Sufficiently Allege Weaver's Scienter

The scienter arguments raised by Plaintiffs' in opposition to the motion to dismiss by Defendants Reddy Ice, Brick and Janusek apply with equal force to the arguments raised by Defendant Weaver and are expressly incorporated herein by reference.  In addition, Plaintiffs set forth herein additional facts and circumstances that demonstrate that Weaver personally, and in connection with the other executive officers of Reddy Ice, including Ben Key, engaged in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care."  *Helwig v. Vencor, Inc.*, 251 F.3d 549, 550 (6th Cir.) (en banc) ), *cert. denied,* 536 U.S. 935 (2002).  *See also In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 718 (S.D. Ohio 2006) ("While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.").

6

The dangers of Reddy Ice's collusive anticompetitive market allocation agreement were known and obvious to Weaver. Indeed, CW2 was personally told by defendant Weaver discuss the unlawful agreement in front of CW2 and others present during an annual plant managers' meeting held in Dallas, Texas (where Reddy Ice has its headquarters). ¶¶ 47-53. Weaver also attended a meeting in 2006 with Ben Key and others executives from Reddy Ice and Arctic Glacier in 2006 to negotiate final execution of Reddy Ice's and Arctic Glacier's agreement to allocate the California and Arizona packaged ice markets. ¶ 56. CW3 further confirmed information about the on-going illegal market allocation agreement between Reddy Ice, Arctic Glacier and Home City. ¶¶ 54-56. These facts more than sufficiently demonstrate that Weaver knew or recklessly disregarded the obvious dangers of Reddy Ice's unlawful market allocation agreements and recklessly misled investors by omitting this material information from the Company's SEC filings. *See Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409, 2006 U.S. Dist. LEXIS 42644, *11-12 (D. Conn. Jun. 19, 2006) (plaintiffs' complaint met the applicable standard for pleading securities fraud by alleging four-year pervasive anti-competitive conduct and that defendants attempted to deceive investors by stating that business success was achieved in a competitive environment); *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452, 468-69 (S.D.N.Y. 2006) (finding actionable securities fraud based upon defendants' nondisclosure of material information regarding company's use of improper business practices to generate substantial earnings); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041, 2000 U.S. Dist. LEXIS 12504, *11-13 (S.D.N.Y. Aug. 31, 2000) (denying motion to dismiss securities fraud action based upon anti-competitive agreement with primary competitor).[4]

---

[4]     *See also In re St. Paul Travelers Sec. Litig.*, 2006 WL 2735221, *4 (D. Minn. Sept. 25, 2006) (failure to disclose illegal bid-rigging and other activities as true cause of companies growth, revenues and renewal rates was actionable); *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 885-86 (E.D. Tenn. 2005) (denying motion to dismiss securities fraud claims alleging that defendants conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the resulting potential liabilities; *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (denying motion to dismiss securities fraud

Like other Defendants, Weaver erroneously argues that the particularized factual allegations derived from confidential witness are not described in the context of the specificity required in securities fraud cases.[5] Weaver Mem. at 3.  The allegations based upon information provided by Confidential Witnesses are cogent and compelling.  Plaintiffs' Confidential Witnesses are described in detail, and all occupied positions at the Company that provided them with personal knowledge of Defendants' misconduct. ¶¶ 46, 47. 54, 57.  Altogether, the number of confidential witnesses, the level of detail of their allegations, and the positions held by them compel a strong inference Defendants acted with scienter.  *Accredo Health*, 2005 U.S. Dist. LEXIS at *47; *Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp 2d 887, 898 (N.D. Ohio 2002) (witnesses need only be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

Defendants seize upon language from one opinion rejecting the confidential sources under specific circumstances that are not present here.  *See Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)).  Judge Posner, who sat on the *Higginbotham* panel, has since explained that confidential sources were discounted in *Higginbotham* because the alleged misconduct took place in a Brazilian subsidiary far away from its corporate parent in America, and "[t]here was no basis," to assert that the parent was aware of the fraud. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-712 (7th Cir. Ill. 2008) (accepting confidential witnesses as valid sources to support plaintiff's allegations and holding that the absence of "proper names" does not invalidate

---

claims based upon omission of bribery scheme for expedited approval of new drug applications because defendants' statements conveyed the impression that the company had particular expertise and success could be compared to other companies).

[5] Similarly, Defendants' reliance on *Perceptron, Inc. v. Sensor Adaptive Machines, Inc.*, 221 F.3d 913 (6th Cir. 2000) for the contention that Plaintiffs must put forth evidence at the pleadings stage to establish Defendants' knowledge of falsity is wrong.  The "rule of reason" analysis is only applied once the litigation is in the discovery phase, a phase not yet commenced in the instant action.  *Id.* at 918-919.

the drawing of a strong inference from informants' assertions).   As in *Makor Issues*, the misconduct at Reddy Ice took place at the corporate headquarters through its executive officers, and the confidential witnesses worked in the headquarters and served as internal auditors and in other positions that provided them with contact with Reddy Ice employees with first-hand knowledge of the illegal conduct and agreements. ¶¶ 46-57.

Like the Confidential Witnesses, Weaver also was in a position to know about Reddy Ice's anticompetitive agreements, which were intrinsic in the Company's day-to-day operations and main source of revenue.   It is not plausible that an executive like Weaver, the Company's President and COO and during 2007 its CEO, was not aware of a nationwide market allocation agreement between Reddy Ice and its two main competitors.   Facts critical to a business' core operations or important transactions generally are so apparent to a company's executives that their knowledge may be reasonably attributed to the company and its key officers.   *See Cardinal Health,* , 426 F. Supp. 2d at 724 ("Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to 'central, day-to-day operational matters.'"); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (imputing strong inference of scienter to CEO and CFO because of their positions in management, the fraud related to core business and the problems were widespread). Plaintiffs thus have pled facts that create a strong inference that Defendant Weaver acted with scienter.

Plaintiffs' scienter allegations are buttressed by allegations of opportunity and motive that compel a strong inference of scienter.   To demonstrate motive, a plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Cardinal Health*, 426 F. Supp. 2d at 726; *FirstEnergy*, 316 F. Supp. 2d at 599 (insider selling at an opportunistic time and when a company's stock price is near an all-time high are probative of scienter).   Defendants' efforts to take Reddy Ice public through its IPO and subsequently raise capital and pursue a growth through its Secondary Offering while the

9

Company's stock price was artificially inflated is further evidence of scienter. *See In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (finding defendants' desire to raise capital through public offerings probative of scienter where plaintiffs included concrete details such as timing, amounts sold and insider selling). Weaver, like other Defendants, sold large blocks of his Reddy Ice holdings in both the IPO and Secondary Offering.[6] In the IPO, Weaver sold 9,000 shares of stock, and in the Secondary Offering he sold an additional 50,000 shares. *See* Pederson Decl., Ex. 2 at 97, and Ex. 3 at 76, respectively. These and other Class Period sales Weaver's Reddy Ice stock (altogether 33% of his holdings) allowed Weaver to reap more than $1.8 million.

Furthermore, Defendants' scheme allowed them to sell their stock at a much higher price than they could have after the disclosure of the antitrust violations, demonstrating the suspicious timing of the insider trading.[7] In addition, Defendants often sold large blocks of Reddy Ice stock on the same day, or within days of each other's sales or sales by Ben Key. ¶ 170. The Individual Defendants in particular collectively sold 129,170 shares of the Company's stock in connection with the Secondary Offering for gross proceeds of over $2.78 million; and they additionally collectively received over $2.53 million in gross proceeds from other suspiciously-timed sales of Company's stock during the Class Period. ¶¶ 169-70. Courts have classified stock sales as

---

[6] According to the Prospectus issued by the Company, in the Secondary Offering, Brick sold 52,379 shares of Reddy Ice stock at an artificially-inflated price, which was more than 20% of his reported holdings of 252,379 shares; and Janusek similarly sold 21,791 shares in the Secondary Offering, which was almost 20% of his reported holdings of 114,066 shares. Brick sold an additional 40,345 shares and Janusek sold an additional 27,442 shares at artificially-inflated prices during the Class Period. ¶ 170. The multi-millions of dollars Brick and Janusek took away from stock sales dwarfed their salaries. *See* ¶ 172. Defendant Booth likewise sold 5,000 shares of his Reddy Ice stock in the Secondary Offering, and he sold over 16,000 additional shares during the Class Period, which was more than 25% of his Reddy Ice holdings.

[7] *See In re Lason, Inc. Sec. Litig.*, 143 F.Supp.2d 855, 859-860 (E.D. Mich. 2001) ("Motive and opportunity were certainly present in this case. The motive was for Lason to continue its growth by acquisition strategy and maintain the appearance of success. The opportunity arose every time that the defendants had the chance to utter falsities to the market to inflate confidence in the company strategy.").

unusual or suspicious based on a variety of factors, which include the amount of profit from sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling. *Id.* (citing *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000)). Thus, both the unusual volume and suspicious timing of the stock sales by insiders, including the Individual Defendants, suggest that Defendants had motive to engage in fraudulent conduct. Plaintiffs' allegations of motive and opportunity, considered in conjunction with the remainder of their allegations, on the whole raise an inference of recklessness and knowing disregard. *See Cardinal Health*, 426 F. Supp. 2d at 726; *Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D. Ohio 2000).

Defendants are not saved by the fact that some of their sales were made pursuant to Rule 10b5-1 trading plans. Initially, a Rule 10b5-1 trading plan is an affirmative defense, which cannot be considered at the motion to dismiss stage. *See Cardinal Health*, 426 F. Supp. 2d at 734; *Mississippi Public Employees Retirement Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008) (averments of insider sales contributed to a strong inference of scienter even if 10b5-1 trading plan existed because, absent discovery, there was no evidence of "when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans"). Moreover, the existence of the 10b5-1 trading plans is irrelevant where, as here, the plan was adopted at a time when the insider possessed material non-public information. *See*, *e.g.*, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 554 (5th Cir. 2007) (Plaintiff "convincingly suggests that the attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because . . . [defendant insider] entered into the Plan during the Class Period.").

Weaver's executive compensation package further supports Plaintiffs' scienter allegations. Courts have held that the magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud. The Complaint alleges that throughout the Class Period, each of the Individual Defendants was

incentivized to increase aggressively the Company's revenues pursuant to the market allocation agreements because each received an annual compensation package based in part upon the Company's performance and revenues. ¶ 171.  In large part because of the illegal agreements, Weaver and each of the Individual Defendants more than doubled his base salary through "pay-for-performance" incentives. ¶ 172-73.  Indeed, Plaintiffs do more than just present "bare allegations." *See Cardinal Health*, 426 F. Supp. 2d at 737-38 (Defendants had motivation to keep company's stock price high in order to collect more than $245 million in incentive-based executive compensation); (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001); *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F. 3d 920, 944 (strong inference of scienter because defendants' eligibility for stock options and executive bonuses were based principally on company's financial performance).

In addition to their pay-for-performance compensation, under certain "change in control" provisions in their employment agreements, the Individual Defendants were entitled to immediate and accelerated vesting of otherwise unvested Restricted Share Units ("RSU") in the event of a change in control, such as a merger. ¶ 174.  During July 2007, while the Company's revenues and earnings were artificially inflated as a result of the Company's illegal participation in the market allocation agreement, Defendants aggressively pursued a merger with GSO Capital Partners, L.P. ("GSO"), causing each RSU outstanding to immediately vest and be converted into the right to receive $31.25 in cash per share. ¶ 175.  The pendency of a merger or acquisition also supports a strong inference of scienter; upon consummation of the merger with GSO, the Individual Defendants collectively stood to receive $6.375 million.[8]  ¶ 176.

---

[8]    *Fidel v. AK Steel Holding Corp.*, 2002 U.S. Dist. LEXIS 18887, at *65 (S.D. Ohio Sept. 19, 2002) (in combination with other indicia, "allegations that Defendants were motivated to artificially inflate AK Steel's stock price in order to complete [a] merger, is sufficient to create a strong inference of [scienter]"); *In re First Energy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (S.D. Ohio 2004), 316 F. Supp. 2d at 599 (motivation to complete a merger "additionally raise[s] a strong inference of scienter").

When viewed in conjunction with these other factors, the Individual Defendants' self-interested motivation to save and enhance their salaries and pay-for-performance compensation present a strong inference of scienter.

Plaintiffs' sufficient allegations of a number of *Helwig* factors, combined with allegations of a deliberate illegal behavior, cumulatively raise cogent and compelling inference that Defendants acted "intentionally, consciously, or, at the very least, recklessly, in violation of the securities laws." *Cardinal Health*, 426 F. Supp. 2d at 741.

**B.    Plaintiffs Sufficiently Allege a Section 20(a) Claim Against Weaver**

Additionally, regardless of whether Plaintiffs adequately allege a Section 10b claim against Weaver, Weaver is liable as a control person of Reddy Ice under Section 20(a). Whether a defendant is a "controlling person" under §20(a) is normally a question of fact that cannot be determined at the pleading stage. *Sanders Confectionary Prods. v. Heller Fin., Inc.*, 973 F.2d 474, 485 (6th Cir. 1992); *SmarTalk*, 124 F. Supp. 2d at 549 (citing *Sanders*, 973 F.2d at 484)). Thus, because the Complaint alleges that defendants possessed the power to control the activity upon which the allegations are based, the §20(a) claims must not be dismissed.

**C.    Plaintiffs Sufficiently Demonstrate Loss Causation**

Plaintiffs have identified the damages suffered by them and Reddy Ice investors as well as pled how those damages were proximately caused by Defendants' fraudulent conduct. While Defendants devote considerable effort to ignoring Plaintiffs' allegations, and the pleading standard – which their motions fail to state – applicable to loss causation allegations on a motion to dismiss, Plaintiffs must simply "provide a defendant with ***some indication*** of the loss and the causal connection ***that the plaintiff has in mind***." *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 347 (2005); *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir. 2007); *In re Daou Sys.*, 411 F.3d 1006, 1025-27 (9th Cir. 2005) (applying *Dura*).[9] Plaintiffs have detailed the

---

[9]    "We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff;" the Supreme Court observed in *Dura*, 544 U.S. at 347; it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of

stock decline subsequent to each disclosure and identified precisely how that stock loss was the direct result of disclosures about Defendants' fraudulent conduct. ¶¶ 126-155, 159-165.

Defendants contend that the disclosures Plaintiffs have pleaded "did nothing more than announce an investigation." Weaver Mem. at 2-3; Def. Mem. at 18. Defendants are wrong. Plaintiffs allege three separate disclosures that informed the market that the success Reddy Ice enjoyed, and that Defendants repeatedly discussed throughout the Class Period, was caused by unlawful, anti-competitive sales practices rather than Defendants' successful execution of a legitimate business strategy as investors had been led to believe.

First, Plaintiffs allege that on March 5 and 6, 2008, Defendants disclosed that the Federal Bureau of Investigation acting on behalf of the Antitrust Division of the DOJ served a search warrant and raided Reddy Ice's corporate headquarters. ¶ 127. Thus Defendants disclosed that a department within the law enforcement arm of the federal government, specifically the department charged with investigating and prosecuting anti-competitive activities, had obtained from a court, based upon evidence of probable cause, a search warrant. This is not the mere "announcement" of an investigation but a disclosure that enough evidence of Reddy Ice's wrongful anti-competitive conduct existed that a court permitted a search warrant to be issued to gather further evidence of Reddy Ice's alleged unlawful activities. Investors understood the ramifications of this information as reflected in the immediate drop of Reddy Ice's stock by almost 34%. ¶ 128.

Second, Plaintiffs allege that more information concerning Reddy Ice's involvement in illegal anti-competitive conduct was revealed in the August 7, 2008 *Wall Street Journal* article

---

the loss and the causal connection that the plaintiff had in mind." *Id.* Such a connection may easily be shown, for example, with indications showing "share–price" declines as "the relevant truth begins to leak out," *id.* at 342, or as it otherwise became apparent that the company's financial condition was not quite what the defendants had made it out to be, *see id.* at 344-45, or as a concealed risk is in fact realized. *Id.*; *see, e.g.*, *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1119 (S.D. Ohio 2007); *In re Cardinal Health, Inc.*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006).

entitled "Collusion Inquiry Targets Ice Companies." This article – which defendants fail to address in their motion – outlines in greater detail the investigation of Reddy Ice and the two other companies that "dominate the national market for wholesale ice and bagged ice," what sort of activities the DOJ had evidence Reddy Ice and others engaged in and were investigating, and that the scheme was "nationwide." ¶ 144. Plaintiffs allege that this news caused an immediate 18% decline in Reddy Ice's stock price. ¶ 146.

Finally, on September 15, 2008, Reddy Ice announced that it had suspended a senior ranking officer for "likely" violations of Company policies and for association "with matters that are under investigation" by the Antitrust Division of the DOJ. ¶ 151. This news caused a further 32% drop in Reddy Ice's stock. ¶ 152. Defendants strive to redefine loss causation to require allegations that Reddy Ice stock declined only upon specific admissions that a specific prior statement was false.[10] That is not the law. Where defendants, as they did here, paint a picture of financial health while omitting material negative information, loss causation may be shown by stock-price declines on revelation of the company's weakness, even without specific admissions of wrongdoing. *Daou*, 411 F.3d at 1025-27; *see also Cardinal Health*, 426 F. Supp. 2d at 758-61; *In re Bradley Pharms., Inc., Sec. Litig.*, 421 F. Supp. 2d 822, 827-29 (D.N.J. 2006). In this case, investors had been led to believe that Reddy Ice was succeeding because the Company's sales and revenue were growing as a result of the execution of a legitimate business plan, and because the Company could offer things its competitors lacked. What investors learned through the March, August and September disclosures was that sales grew because Defendants were colluding with the two other packaged ice market leaders to fix prices and split sales territories.

---

[10]     Defendants ask this Court to skip past the inquiry of whether plaintiffs have adequately **pleaded** loss causation and jump ahead to determining whether plaintiffs have **proved** loss causation. MTD at 18-20. This inquiry is inherently merits based, is burdened by factual determinations meant for the trier of fact and is wholly inappropriate at this stage of the proceedings. *In re America Service Group, Inc.*, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 31, 2009) (citing *Caremark*, 113 F.3d at 649 (rejecting defendants "contention of alternate causes of Plaintiffs' losses" noting that "a trier of fact can determine the damages attributable to the fraudulent conduct.").

That Defendants have not been charged with any crimes associated with these alleged acts is irrelevant. Indeed, stock price declines on news of government investigations suffice, even if specific violations are not immediately identified. *Bradley*, 421 F. Supp. 2d at 828-29; *Eastwood*, 2009 U.S. Dist. LEXIS 88945, at *16; *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239 (D. Mass. 2006)(finding loss causation adequately pled where the plaintiffs had alleged that the company's disclosure of an SEC investigation relating to Defendants' misleading statements had "shocked the market" and caused the stock price to drop); *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 U.S. Dist. LEXIS 376 (N.D. Ill. 2005)(crediting as "partial disclosures of prior misrepresentations and omissions" the company's issuance of a press release announcing a lawsuit, a SEC and a DOJ investigation against the defendants).[11]

Plaintiffs' allegations "show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market," *Omnicare,* 583 F.3d at 944, and more than satisfy their burden under *Dura*.

## IV.    <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully submit that Defendants' Motion to Dismiss should be denied in its entirety.[12]

DATED: January 18, 2010                    Respectfully submitted,

---

[11]    Defendants' cases to the contrary are distinguishable. In both *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880 (N.D. Cal. 2008) and *In re Hansen Natural Corp. Sec. Ligit.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007), the disclosures relied upon by the plaintiffs announced merely that the companies had begun internal investigations concerning stock option granting practices. *Rudolph*, 560 F. Supp. 2d at 887; *Hansen*, 527 F. Supp. 2d at 1162. In neither case was there an announcement that a federal law enforcement agency obtained a search warrant to gather further evidence of a potential crime as plaintiffs have alleged here. As for *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214 (E.D. Wa. 2005), the plaintiffs stated in their complaint that "[t]he facts [showing the falsity of defendants' representations] still have not been disclosed by defendant to the public." *Id.* at 1220. Here, plaintiffs allege just the opposite.

[12]    If the Court finds any of Plaintiffs' claims to be deficient, Plaintiffs request leave to replead. *See* Fed. R. Civ. P. 15(a) (noting that leave to replead should be "freely given").

16

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**

*/s/ Gregory M. Castaldo*
GREGORY M. CASTALDO
LAUREN WAGNER PEDERSON
MARK S. DANEK
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
gcastaldo@btkmc.com
lpederson@btkmc.com
mdanek@btkmc.com

*Lead Counsel for Lead Plaintiffs and the Class*


**COUGHLIN STOIA GELLER**
**RUDMAN & ROBBINS LLP**
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@csgrr.com

*Counsel for Plaintiff Lawrence Diamond*
**ZAUSMER, KAUFMAN, AUGUST,**
**CALDWELL & TAYLOR, P.C.**
MARK. J ZAUSMER (P31721)
KARYN A. THWAITES (P66985)
31700 Middlebelt Road, Suite 150
Farmington Hills, MI 48334
Telephone:  248/851-4111
248/851-0100 (fax)
mzausmer@zkact.com
kthwaites@zkact.com

*Liaison Counsel for Plaintiffs and the Class*

17

## CERTIFICATE OF SERVICE

I hereby certify that January 18, 2010, I electronically filed the forgoing Consolidated Class Action Complaint with the Clerk of the Court using the ECF system which will send notification of such filing to:  David A. Ettinger, James R. Nelson, Raymond W. Henney, and Samuel B. Isaacson.

/s/ Gregory M. Castaldo