UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN CHAMBERLAIN, Individually
and on Behalf of All Others
Similarly Situated,

     Plaintiffs,       Case No. 08-cv-13451

                Paul D. Borman
v.              United States District Judge

                R. Steven Whalen
                United States Magistrate Judge

REDDY ICE HOLDINGS, INC., WILLIAM
P. BRICK, JIMMY C. WEAVER, STEVEN
J. JANUSEK AND RAYMOND D. BOOTH,

     Defendants.
_____/

OPINION AND ORDER
(1) DENYING DEFENDANTS REDDY ICE HOLDINGS, INC., WILLIAM P. BRICK AND
STEVEN J. JANUSEK'S MOTIONS TO DISMISS (DKT. NO.78);
(2) DENYING DEFENDANT JIMMY C. WEAVER'S MOTION TO DISMISS (DKT. NO. 41);
(3) GRANTING DEFENDANT RAYMOND D. BOOTH'S MOTION TO DISMISS (DKT. NO.
39); AND (4) GRANTING DEFENDANTS' MOTION TO SUPPLEMENT (DKT. NO. 82)

   This matter is before the Court on Defendants Reddy Ice Holdings, Inc. ("Reddy Ice"),

William P. Brick ("Brick") and Steven J. Janusek's ("Janusek") Motion to Dismiss (Dkt. No. 43

redacted at Dkt. No. 78), Defendant Jimmy C. Weaver's ("Weaver") Motion to Dismiss (Dkt. No.

41) and Defendant Raymond D. Booth's ("Booth") Motion to Dismiss (Dkt. No. 39). Plaintiffs have

filed responses. (Dkt. Nos. 48, 47 and 46.) Defendants have filed replies. (Dkt. Nos. 58, 59 and

57.) The Court held a hearing on October 22, 2010. For the reasons that follow, the Court DENIES

Defendants Reddy Ice, Brick, Janusek and Weaver's motions to dismiss and GRANTS Defendant

Booth's motion to dismiss. The Court further GRANTS Defendants Reddy Ice, Brick and Janusek's Motion for Leave to Supplement Pending Motion to Dismiss, (Dkt. No. 82), based upon the parties' briefs and without necessity for oral argument. *See* E. D. Mich. L. R. 7.1(f).

## I.    BACKGROUND

### A.    The Packaged Ice Litigation

On June 5, 2008, the United States Judicial Panel on Multidistrict Litigation ("MDL") assigned to this Court a number of related civil antitrust actions against the three dominant players in the Packaged Ice Industry, Reddy Ice Holdings and its wholly owned subsidiary Reddy Ice Corporation ("Reddy Ice"), Arctic Glacier Income Fund and its wholly owned subsidiary Arctic Glacier, Inc. ("Arctic Glacier") and the Home City Ice Company ("Home City"). Those cases are now consolidated in *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952 (E.D. Mich. 2008). On July 1, 2010, this Court denied the Defendants' motion to dismiss the Direct Purchaser's Consolidated Amended Class Action Complaint in the antitrust litigation. (*In re Packaged Ice Antitrust Litig.*, Dkt. No. 260.)

The instant securities fraud class action, *Chamberlain v. Reddy Ice Holdings, Inc.*, Case No. 08-13451, originally filed on August 8, 2008 and reassigned pursuant to E.D. Mich. L.R. 83.11 to this Court on August 14 2008, is a tag-a-long case to the multidistrict antitrust litigation. On July 17, 2009, this Court consolidated *Chamberlain* with two related securities cases, *Coffey v. Reddy Ice Holdings, Inc., et al.*, Case No. 08-13670 and *Neal v. Reddy Ice Holdings, Inc., et al.*, Case No. 08-14036. (Dkt. No. 26.) On July 27, 2009, the Court appointed Lawrence Diamond and the Southeastern Pennsylvania Transportation Authority ("SEPTA") interim lead Plaintiffs in this action and appointed Schiffrin Barroway Topaz & Kessler, LLP (now Barroway Topaz Kessler Meltzer

& Check LLP) interim lead counsel and Zausmer, Kaufman, August, Caldwell & Taylor, P.C. as interim liaison counsel for the class. (Dkt. No. 28.)

On November 2, 2009, Plaintiffs filed a Consolidated Class Action Complaint ("CCAC") alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and of Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240 (Count I) and of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (Count II). The CCAC alleges that Defendants knowingly and recklessly omitted material information regarding allegedly unlawful market allocation agreements in the Packaged Ice Industry among Reddy Ice, Arctic Glacier and Home City. The CCAC alleges that these omissions and failures to disclose material information resulted in significant financial losses to Plaintiffs, purchasers of Reddy Ice securities between August 10, 2005 and September 15, 2008, after the truth behind these omissions became known to the market and Reddy Ice stock suffered a precipitous decline in market value.

Defendants Reddy Ice, William P. Brick ("Brick"), Steven J. Janusek ("Janusek"), Jimmy C. Weaver ("Weaver") and Raymond D. Booth ("Booth"), now move to dismiss the CCAC pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 *et seq.* ("PSLRA"). Reddy Ice, Brick and Janusek filed their motion to dismiss (Dkt. No. 78) and Defendants Weaver and Booth filed separate motions to dismiss (Dkt. Nos. 41 and 39 respectively), joining in the motion of Reddy Ice, Brick and Janusek and arguing separately as to the Plaintiffs' failure to plead scienter specifically as to them. Plaintiffs filed separate responses to each motion. (Dkt. Nos. 48, 47, 46) and Defendants filed replies (Dkt. Nos.

58, 59 and 57.)  The Court will address all three motions jointly in the instant opinion and order.[1]

**B.      The Allegations of the CCAC**

**1.      Summary of the allegations.**

Plaintiffs are purchasers of Reddy Ice's publicly-traded securities between August 10, 2005 and September 15, 2008.  The CCAC alleges that Reddy Ice is the "nation's largest packaged ice manufacturer" with "locations in 31 states and the District of Columbia" selling packaged ice in 7-50 pound bags to "supermarkets, convenience stores and retail outlets."  (CCAC ¶¶ 1, 2, 34.) According to the CCAC, in August 2005, Reddy Ice conducted an initial public offering ("IPO") of its stock, issuing 11.7 million shares at $18.50 per share, raising over $190 million and paying to its controlling shareholders, which included Weaver, Janusek and Booth, $56.5 million in proceeds. In a follow-on secondary offering nine months later ("the Secondary Offering"), Reddy Ice sold an additional 4.59 million shares of common stock to investors at $21.55 per share, generating an additional $98.9 million that was "paid to the controlling shareholders, including Defendants in this action."  (CCAC ¶ 3, 37, 38.)

The CCAC alleges that following the IPO and Secondary Offering, Reddy Ice grew and touted an "aggressive business plan," loyal customer base "generated through quality, service and price," a "large geographic footprint" that gave Reddy Ice "a competitive advantage in its primary markets."  Reddy Ice simultaneously expressed its "strict adherence" to a company code of ethics which expressly prohibited violating the antitrust laws and "was signed by the Company's executive

---

[1]  The Court predominantly refers to the motion to dismiss filed by Reddy Ice, Brick and Janusek, which will be cited as "Defs.' Mot."  The Court reviews only the redacted version, (Dkt. No. 78), which was submitted pursuant to this Court's April 28, 2010 Order (Dkt. No. 76).  When the Court is referring specifically to either of the motions filed by the individual Defendants Weaver and Booth, the Court will indicate "Weaver Mot." or "Booth Mot."

officers." (CCAC ¶ 4.)  Reddy Ice reported revenues in 2005, 2006 and 2007 of $317 million, $346 million and $339 million, respectively.  (CCAC ¶ 40.)  The CCAC alleges that while making these representations regarding it business operations and competitive position in the packaged ice market, Reddy Ice and the other Defendants knowingly and recklessly omitted and failed to disclose the fact that it was a party to unlawful and deceptive agreements with its major competitors, Arctic Glacier and Home City, to allocate customers and markets in violation of the U.S. antitrust laws.  The CCAC alleges that because of these illegal agreements, Reddy Ice was able to raise, fix and maintain the price of packaged ice.  (CCAC ¶ 42.)  The CCAC alleges that these unlawful agreements gave Reddy Ice, and the other packaged ice participants in the market allocation agreement, control over price competition in the nationwide market for packaged ice,  resulting in an artificial increase in Reddy Ice's business and revenues, driving the Company's stock price "as high as $31.18 per share during the class period."  (CCAC ¶¶ 5-7, 42.)

The CCAC alleges that on March 5, 2008, just a few months after news that Reddy Ice had abandoned a potential merger with a hedge fund drove Reddy Ice stock down to $22.34 per share, the FBI executed a search warrant and raided Reddy Ice's Dallas, Texas headquarters.  The following day, on March 6, 2008, Reddy Ice issued a press release announcing that "federal officials executed a search warrant at the Company's office in Dallas on March 5, 2008" and that the "Company [was] cooperating with the authorities."  On March 7, 2008, Reddy Ice issued a follow-up press release disclosing that "[t]he execution of the search warrant was directed by the Antitrust Division of the United States Department of Justice (the "DOJ") in connection with an investigation of the packaged ice industry."  (CCAC ¶¶ 6-10, 61, 126-128.)   Following this news, on March 7, 2008, according the CCAC, Reddy Ice's stock price declined, on unusually heavy trading volume,

"from approximately $23.57 per share to $15.38, for a one-day market capitalization loss of $180 million." (CCAC ¶ 11.) The CCAC alleges that Reddy Ice disclosed in its Annual Report for fiscal 2007 that Reddy Ice had received grand jury subpoenas seeking information in connection with the DOJ's packaged ice industry investigation. (CCAC ¶ 61.) According to the CCAC, Reddy Ice denied knowledge of any unlawful behavior, stating in March, 2008 that "Senior Management is not aware that the Company has engaged in anticompetitive behavior, or other activities, which would violate that antitrust laws." (CCAC ¶ 129.)

The CCAC alleges that Reddy Ice continued to deny any improprieties despite news and other disclosures discussing the allegedly unlawful conduct, including an August 7, 2008 *Wall Street Journal* article that described an interview with Martin McNulty, a former vice president of sales with Arctic Glacier, who alleged that he had provided prosecutors with evidence of an agreement among Reddy Ice, Arctic Glacier and Home City to divide up customers and stay out of each other's sales regions. On this same day, after news of McNulty's interview, Reddy Ice shares fell an additional $2.40 per share to close on August 7, 2008 at $10.99 per share, "again on unusually high trading volume." (CCAC ¶¶ 12-13.)

On September 15, 2008, Reddy ice announced that it had suspended its Executive Vice President of Sales and Marketing, Ben D. Key, on a finding that Mr. Key had "violated Company policies in connection with the antitrust violations under investigation by the DOJ." (CCAC ¶ 14, 64, 126-127, 129, 151.) As a member of Reddy Ice's management team, Key attended meetings of the International Packaged Ice Association ("IPIA") and the Western Ice Association ("WIA") and held positions as an officer of both associations. (CCAC ¶ 64.) Also on September 15, 2008, according to the CCAC, "Reddy Ice announced that it was suspending its dividend because of

'weaker than expected operating results and costs related to the ongoing antitrust investigations and related litigation." (CCAC ¶ 19.) That day, following news of "Key's implication in the criminal activities under investigation by the DOJ and the related adverse impact on Reddy Ice's financial condition, the Company's shares fell an additional $1.09 per share" to close at $6.75 per share and falling the next day, September 16, 2008, a further 34.8 percent to close at $4.40 per share, again on extremely heavy trading volume. According to the CCAC, "Reddy Ice's shares have not recovered and currently trade in the $4.00 range." (CCAC ¶ 19, 152.)

The CCAC alleges that the Defendants failed to disclose material information, specifically that Reddy Ice:

> (1) had engaged, and continued to engage in illicit business practices with its competitors in the packaged ice industry and had unlawfully joined with its competitors in the packaged ice industry in colluding and agreeing to allocate territories and customers in the United States' packaged ice market:
>
> (2) had agreed with its competitors in the industry to fix, raise, maintain and stabilize prices for packaged ice in the United States market and that Reddy Ice's revenue and earnings had been artificially increased through the use of such illicit business practices, and as a result, the Company's financial statements were false and misleading at all relevant times;
>
> (3) had engaged in illicit business practices that exposed the Company to risks of criminal and civil liability and penalties that threatened its existence and continuing business practices;
>
> (4) had falsely certified that it had adequate internal and financial controls and operated under and ensured strict compliance with a code of ethics that expressly prohibited agreements that violated the U.S. antitrust laws; and
>
> (5) had repeatedly issued statements about the Company's competitive position, financial well-being and future business prospects that were lacking in any reasonable basis when made.

(CCAC ¶ 20.) Plaintiffs claim that the revelation of this wrongful conduct caused a direct and precipitous decline in the market value of Reddy Ice stock and a concomitant significant financial

loss to Plaintiffs and all class members.

## 2. Evidence of the allegedly illegal scheme.

The CCAC alleges that the conspiracy to allocate markets, territories and customers and to fix prices was described by a former Arctic Glacier employee, Martin McNulty, in McNulty's complaint in a related whistleblower case, also pending before this Court, *McNulty v. Reddy Ice, et al.*, Case No. 08-cv-13178 (E.D. Mich. 2008).[2] (CCAC ¶ 44.) According to the CCAC, McNulty claims in his complaint to have been informed by Arctic Glacier's then Vice-President of Sales, Keith Corbin, that Arctic Glacier, Reddy Ice and Home City "unlawfully allocated markets between themselves for the exclusive sales of packaged ice." (CCAC ¶ 45.) The CCAC claims that McNulty was told by Mr. Corbin that "the conspiracy with Reddy Ice extended throughout the United States," each backing away from or staying out of the other's territory, enabling Reddy and Arctic Glacier to "get their prices up." (*Id.*) The CCAC refers to McNulty's Complaint in his whistleblower action

---

[2] As this Court did in its recent Opinion and Order Denying Direct Purchaser Defendants' Motion to Dismiss in the related antitrust multidistrict litigation, *In re Packaged Ice Antitrust Litig.*, __ F. Supp. 2d __, 2010 WL 2671306 at * 22 n. 2 (E.D. Mich. July 1, 2010), the Court takes judicial notice of, and at times refers to, allegations made in the complaints filed in this Court in the antitrust case and in the related whistleblower action filed against Reddy Ice by Martin McNulty, *McNulty v. Reddy Ice Holdings, Inc.,* No. 08-13178. *See Hinds County, Mississippi v. Wachovia Bank, et al.*, 700 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2010) (court in lead action in multidistrict antitrust litigation taking judicial notice of first amended complaint filed in a related action, recognizing the court's inherent power to rely on matters of public record in deciding a motion to dismiss, citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) and *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000)). *See also Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir.1980) (taking judicial notice of the facts alleged in a related state-court action "[b]ecause this court sits to decide real cases, not abstract questions of law, and because an adequate understanding of [the] case is essential to our decision."); *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875 (E. D. Tenn. 2005) (taking judicial notice of pleadings from previous litigation). "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).

where he alleges detailed first-hand conversations with Arctic Glacier's Vice President of Sales, Keith Corbin, in which Corbin described in the agreements between Reddy Ice and Arctic Glacier to stay out of each other's territories, enabling them each to "get their prices up." (CCAC ¶¶ 13, 44-45, 65, 144; Pls.' Resp. Ex. 1, Declaration of Lauren Wagner Pederson, McNulty Compl. ¶¶ 34-38.)

The CCAC alleges the following with respect to several confidential witnesses (CWs) whom Plaintiffs claim corroborate the McNulty allegations and offer further proof of Plaintiffs' claims of an illegal market allocation agreement:

***Confidential Witness Number One***

CW1 is a former Reddy Ice employee who held the position of National Purchasing and Contracts Manager for Reddy Ice from mid-1997 to late-2004. CW1 became aware during his tenure with Reddy Ice, through discussions held in his presence and in the presence of other employees at Reddy Ice's Dallas headquarters, that "Reddy Ice agreed not to compete against Arctic Glacier in California, and that Arctic Glacier in exchange for the right to service California without competition from Reddy Ice, agreed to "stay out" of Arizona, a market serviced by Reddy Ice." (CCAC ¶ 46.)

***Confidential Witness Number Two***

CW2 is a former Reddy Ice employee who held the positions of internal auditor, area controller and utilities specialist from January 2006 through March 2008. Through his positions in the financial sector of Reddy Ice, CW2 was privy to highly sensitive information relating to financial performance and business practices, such as revenue, expenses and budget data for all of the manufacturing plants in his assigned territory. CW2 learned of an agreement between Reddy Ice and Arctic Glacier to allocate territories and markets and was personally told of this agreement by

Defendant Weaver. CW2 also was told by other Reddy Ice employees that Defendant Brick entered into the agreement with Arctic Glacier to allocate territories. CW2 was told that Reddy Ice agreed to sell its California manufacturing operations to a consortium of companies in California with the understanding that Arctic Glacier would subsequently acquire the consortium of companies, giving Arctic Glacier access to all of the packaged ice manufacturing facilities that had been acquired from Reddy Ice. CW2 attended an annual plant managers meeting in February 2006 or 2007 where the agreement was discussed by several management attendees, including Weaver and Janusek. (CCAC ¶¶ 49-52.) According to CW2, it was regularly discussed amongst various Reddy Ice employees that Home City was a party to the agreement to divide up markets and that CW2 was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had agreed to stay out of certain Midwest states where Home City had a presence. CW2 learned first hand that Defendants Weaver and Janusek knew of the agreement with Home City. (CCAC ¶¶ 52-53.)

According to CW2, he was informed by an area controller with first hand knowledge that Reddy Ice would manipulate prices, lower them dramatically to drive out a particular competitor until the smaller company went out of business. (CCAC ¶ 58.) Specifically, CW2 knew of a plan to drive a competitor in Arizona out business by dramatically reducing its prices in the area served by the competitor but that this plan was never realized due to the raid on Reddy Ice's headquarters in March 2008. (CCAC ¶ 60.)

***Confidential Witness Number Three***

CW3 is a former Reddy Ice internal audit manager employed at Reddy Ice's Dallas headquarters from June 2005 through July 2008. CW3 was responsible for overseeing internal audits and Sarbanes-Oxley testing and for reporting confidential information to the audit committee.

CW3 states that he has knowledge of the purchase of the Reddy Ice California manufacturing operations by a consortium of California companies through his audit responsibilities. According to CW3, Reddy Ice and the consortium of companies entered into a covenant not to compete whereby Reddy Ice agreed to purchase from the consortium a manufacturing plant in Arizona. According to CW3 he was told by other Reddy Ice employees that Defendants Janusek and Brick, and Reddy Ice's Vice President of compliance, Nancy Green, along with Ben Key, attended a meeting in 2006 to discuss Arctic Glacier's purchase of the California consortium that had previously purchased the majority of Reddy Ice's California manufacturing operations. (CCAC ¶¶ 54-56.)

*Confidential Witness Number Four*

CW4 is a former Reddy Ice plant manager for one of Reddy Ice's large manufacturing facilities in Arizona from mid-2007 through late-2008. According to CW4, he was told by other Reddy Ice employees that Reddy Ice and Arctic Glacier had "management meetings" during which a deal was struck whereby Arctic Glacier agreed to leave California while Reddy Ice agreed to stay out of Arizona.

**3.      Government investigations of Reddy Ice and criminal guilty pleas by Arctic Glacier and Home City.**

The CCAC further alleges that, following the March 5, 2008 execution of a search warrant by the DOJ Antitrust Division at Reddy Ice's Dallas headquarters, Reddy Ice disclosed in its Annual Report for 2007 that employees of Reddy Ice, including members of management, had received grand jury subpoenas to appear in the United States District Court for the Eastern District of Michigan in connection with the criminal probe of the packaged ice industry. (CCAC ¶ 61.) Reddy Ice also disclosed that the Attorneys General for the states of Florida and Arizona had issued "civil

investigative demands" for documents "as part of a multi-state antitrust investigation of the packaged industry." (CCAC ¶ 63.)

On June 18, 2008, the United States District Court for the Southern District of Ohio unsealed a guilty plea that had been entered into on October 30, 2007 by Home City in which Home City, through it president and CEO Thomas Sedler, pled guilty to participating in a conspiracy to suppress and eliminate competition by agreeing "with other packaged ice manufacturers to allocate customers and territories" in Southeastern Michigan. (CCAC ¶ 62.) On or about October 13, 2009, Arctic Glacier and three of its top executives pled guilty to the same charges, admitting that during the period March 1, 2005 (January 1, 2001 in the case of Arctic Glacier) to July 17, 2007 these defendants knowingly violated the antitrust laws by participating in a conspiracy to suppress and eliminate competition by agreeing with other packaged ice manufacturers to allocate customers in Michigan. According to the CCAC, Home City's guilty plea and the ongoing investigations into Reddy Ice and Arctic Glacier "spawned over ninety civil antitrust laws suits against Reddy ice and its competitors alleging that these companies conspired with one another to allocate territory and fix or stabilize the price of packaged ice sold in the United States and Canada." (CCAC ¶ 63.)

4.    **The allegedly materially false and misleading statements issued by Reddy Ice during the class period.**

The CCAC alleges that Reddy Ice made numerous false and misleading statements during the class period (August 10, 2005 to September 15, 2008) in various public SEC filings as well as in press releases and annual reports, which caused Reddy Ice shares to trade at inflated prices. Plaintiffs claim that Reddy Ice deceived the investing public by stating in multiple public disclosures that its financial success was due to lawful competition, when in fact Reddy Ice's success was the result of the above-described anticompetitive behavior and by expressly disavowing in those public

disclosures participation in any customer or market allocation agreements with its competitors. The allegedly misleading statements include:

- SEC Prospectus filed on August 10, 2005 in connection with the IPO claiming that Reddy Ice was the largest manufacturer of packaged ice in the United States, claiming competitive strengths including a unique multi-state presence, a leading market position in the Sun Belt and other markets, and a strong incentivized management team. The Prospectus identified business strategies including enhancing revenue growth from existing customers, selectively pursuing acquisitions and continuing efficiency improvements. The Prospectus identified a highly competitive market as one of the main business challenges faced by Reddy Ice. (CCAC ¶¶ 66-70.)

- November 1, 2005 earnings release claiming increased revenues for the third quarter of 2005 over the third quarter results in 2004 and increased net income, decreased net loss per share and aggressive acquisitions for the quarter. (CCAC ¶ 73-74.)

- Form 10-Q filed with the SEC on November 4, 2005, signed by Janusek and Brick, indicating that Reddy Ice faced many competitors in the packaged ice industry and competed primarily on price, service and quality. Brick and Janusek certified the veracity of the Form 10-Q pursuant to the requirements of the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley"), indicating their responsibility for establishing and maintaining the company's disclosure controls and indicating that all of the information in the Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company." (CCAC ¶ 75-76.)

- 2005 Form 10-K indicating Reddy Ice's competitive pricing and market position as the sole supplier of packaged ice to the top twenty retail ice customers. The 2005 Form 10-K indicating a highly competitive market and strong customer relationships to whom Reddy Ice was the sole supplier. (CCAC ¶ 81-83.)

- On March 16, 2006, Reddy Ice disclosed that it complied with the Company's Code of Business Conduct and Ethics (the "Ethics Code"), which Brick states in the forward that he has personally taken the time to study "carefully" and which is required to be signed by all Reddy Ice employees. The Ethics Code expressly acknowledges that "[s]ome of the most serious antitrust offenses occur between competitors, such as agreements to fix prices or divide customers, territories or markets. Accordingly, it is important to avoid discussions." The Ethics Code further recognizes that unlawful agreements need not be written and that "any agreements with possible antitrust implications should be made only with the prior approval of legal counsel." (CCAC ¶ 86-87.)

- February 23, 2006 press release indicating increased revenues for the fourth quarter

of 2005, indicating that "typical market forces" led to the financial results.

- May 5, 2006 Registration Statement and Prospectus filed with the SEC in connection with Reddy Ice's Secondary Offering, largely repeating the same disclosures regarding business, prospects, strategy and risks as provided in the IPO Prospectus. (CCAC ¶¶ 92-95.)

According to the allegations of the CCAC, for the next eight quarters, Reddy Ice made similar public disclosure statements, indicating increasing revenues in a "highly competitive" environment, repeatedly acknowledging the company's compliance with its Ethics Code and specifically addressing its obligation to comply with antitrust laws, and containing substantially similar Sarbanes-Oxley required certifications and 10-Ks signed by Defendants Brick, Janusek and Weaver. (CCAC ¶¶ 89-91, 97-99, 102-103, 106-109, 111-114, 115-117, 118-120, 122-125.)

**5. Revelations of the DOJ investigation and related corporate internal investigations, guilty pleas by competitors and news of claims of a nationwide conspiracy in the packaged ice industry affect the price of Reddy Ice stock.**

The CCAC further alleges that on March 14, 2008, Reddy Ice filed its Form 10-K for Year Ended 2007 with the SEC. While disclosing the March 5, 2008 search warrant execution on its headquarters by the DOJ, Reddy Ice did not disclose its alleged agreements with Arctic Glacier and Home City to divide up territories. In fact, the Form 10-K stated that "Senior Management is not aware that the Company has engaged in anticompetitive behavior, or other activities, which would violate the antitrust laws." Reddy Ice continued to maintain that the packaged ice industry was "highly competitive" but also added that it was "closely monitoring industry developments and trends," indicating that it was facing some new forms of competition from free-standing ice vending machines. Reddy Ice still indicated, as it had in previous years, that it was in full compliance with its Ethics Code and with all antitrust laws and was engaging in fair dealings with its customers. According to the CCAC, despite the drop in share price to $15.38 per share on March 7, 2008

following disclosure of the DOJ investigation, as a result of these continued false assurances, Reddy Ice's shares continued to trade at an inflated price.  (CCAC ¶¶ 126-133**.**)

On April 30, 2008, Reddy Ice filed with the SEC an earnings release for its quarter ended March 31, 2008, indicating decreased revenues and stating that competition in the packaged ice industry was "challenging" in light of the DOJ's ongoing investigation.  According to the CCAC, in an earnings conference call with analysts on April 30, 2008, Defendant Brick refused to answer questions about the DOJ investigation and reiterated that the competitive environment was not "radically different," and stated that the recent operating results were driven by weather and competition from free standing vending machines.  (CCAC ¶¶ 135-137.)  The CCAC alleges that because of these continued false assurances and failures to disclose the underlying anticompetitive conduct, Reddy Ice shares, although falling in price per share to $13.24, continued to trade at inflated prices.  (CCAC ¶ 139.)  Reddy Ice's May 5, 2009 Form 10-Q continued to attribute decreased revenues to weather and reiterated the company's compliance with all Sarbanes-Oxley requirements.  Reddy Ice indicated that it had incurred $1.2 million in expenses defending itself against shareholder lawsuits as well as the DOJ investigation.  Reddy Ice did not disclose an active role in the alleged market allocation agreements with Arctic Glacier and Home City and stated it was unable to predict the outcome of the investigations on Reddy Ice.  (CCAC ¶ 140-141.)

According to the CCAC, on June 19, 2008, the *Dallas Business Journal* published an article disclosing the Home City guilty plea, which had been filed late in 2007 but only unsealed in June, 2008, to conspiring with competitors in Southeastern Michigan to allocate customers and territories in the packaged ice industry.  On August 7, 2008, the *Wall Street Journal* published an article disclosing in detail McNulty's claims that Arctic Glacier, Reddy Ice and Home City were engaged

in a nationwide conspiracy to allocate customers and disclosing McNulty's cooperation with the FBI in investigating the packaged ice industry.  The article also disclosed the Home City guilty plea and the raid on Reddy Ice's headquarters in March, 2008.  (CCAC ¶¶ 143-144.)  Also on August 7, 2008 Reddy Ice filed its earnings release for the period ending June 30, 2008, indicating a decrease in revenues due to "new pricing pressures" and "current economic trends" and disclosing an "exponential increase" in the costs, $4.6 million, associated with the DOJ investigation.  (CCAC ¶ ¶ 145.)  On this news, Reddy Ice shares fell and closed on August 7, 2008 at $10.99 per share, on unusually heavy trading volume.  (CCAC ¶ 146.)  On August 8, 2008, Reddy Ice filed its Form 10-Q, for the second quarter, repeating the financial results of the Form 10-K filing and attributing decreased revenue to "economic trends and weather." This filing contained the standard statement of risk factors and Sarbanes-Oxley certifications as had been filed in previous years and did not mention Reddy Ice's participation in any market allocation agreements with Arctic Glacier or Home City. (CCAC ¶ 147.)  According to the CCAC, Reddy Ice shares traded at $10.93 on August 8, 2008 at an inflated price due to Reddy Ice's continuing assurances of competitive behavior.  (CCAC ¶ 149.)

On September 15, 2008, Reddy Ice disclosed that it was suspending Ben D. Key for likely violation of company policies and Key's association with matters under investigation by the DOJ. *See infra* discussion at p. 53, n. 9.  On this news, Reddy Ice's stock closed at $4.40 per share on September 16, 2008 and continued to fall the next day to $3.43 per share - a fraction of the $18.50 IPO price.  (CCAC ¶¶ 151-152.)  In its quarterly report for the third quarter ended September 30, 2008, Reddy Ice disclosed that as a result of the decline in its stock price, the total stockholder's equity exceeded its market capitalization and that the Company's goodwill was impaired.  (CCAC

¶ 153.)

The CCAC alleges that during the class period, Reddy Ice's misrepresentation and omissions, which failed to disclose that the company was recognizing significant amount of revenue from the market allocation agreements with it major competitors, resulted in an inflated share price, causing Reddy Ice stock to trade at levels up to and above $31 per share. The CCAC alleges that as a direct result of the disclosures discussed above, specifically those that occurred on March 6, August 7 and September 17, 2008, Reddy Ice's stock price suffered material, statistically significant declines which removed the inflation from Reddy Ice's stock causing a real economic loss of at least $13.47 per share to investors who purchased during the class period. (CCAC ¶¶ 159-164.) The CCAC alleges that magnitude and timing of this decline negates any inference that the loss suffered by the class members was due to market conditions, macroeconomic or industry factors. According to the CCAC, on March 7, 2008 when Reddy Ice stock suffered a 34% decline the Dow Jones Industrial Average was down by only 1.2% and the S&P 500 was down less than 1%. On August 7, 2008, when Reddy Ice stock suffered an 18% decline, those indices were down by less than 2% each. On September 15 and 16, 2008, when Reddy Ice stock suffered declines of 14% and 35% respectively, those indices were down 4-5% and 1.3-1.8% on those respective dates. (CCAC ¶ 165.)

6. **The individual Defendants' personal gain from the alleged market allocation agreements and their knowledge of the agreements to divide up territories.**

The CCAC alleges that "at the beginning of the class period, on or about August 10, 2005, the Defendants took advantage of the artificially-inflated price of the Company's securities in connection with Reddy Ice's IPO." (CCAC ¶ 168.) According to the CCAC, Defendants Janusek, Weaver and Booth collectively sold 2,448,151 shares at a price of $18.50 per share for gross proceeds of over $45 million. In connection with the Secondary Offering, these Defendants sold an

additional collective 129,170 shares for gross proceeds of over $2.78 million.  (CCAC ¶¶ 168-169.)

In addition to these sales of stock, the individual Defendants sold stock periodically up through and

including June 1, 2007, for additional collective gross proceeds of over $2.53 million.  (CCAC ¶

170.)

In addition to gross proceeds received for their sales of stock, the individual Defendants also

received lucrative compensation packages and bonuses tied to Reddy Ice's performance.  For the

years 2006-2008, these Defendants, according to the allegations of the CCAC, earned the following

annual compensation amounts: Brick - $3,533,205; Janusek - $1,606,210; Weaver - $2,535,998; and

Booth - $854,426.  (CCAC ¶¶ 171-173.)

The CCAC alleges that the individual Defendants, "by virtue of their receipt and possession

of information reflecting the true facts regarding Reddy Ice's competitive practices and pricing, and

their control over the Company's materially misleading misstatements and their executive positions

with the Company, which made them privy to confidential proprietary information concerning the

Company's illegal agreements, knowingly and recklessly participated in the fraudulent scheme . .

. ."  (CCAC ¶ 177.)

The CCAC alleges that Defendants Brick, Weaver and Janusek signed Reddy Ice's Form 10-

K for fiscal 2006 and 2007 in which Reddy Ice expressly disavowed anticompetitive behavior and

touted the company's ability to dominate the industry through legitimate, lawful competition.  The

CCAC alleges that each of the Defendants was involved in the day-to-day operations of Reddy Ice

and caused the dissemination of the materially misleading statements.  Specifically, based on CW

testimony, Brick negotiated the deal with Arctic Glacier, and Janusek and Weaver had actual

knowledge of the deal.  (CCAC ¶¶ 180-181.)  Brick publicly declared that he read and understood

the Ethics Code that disavows anticompetitive behavior and Weaver, Janusek and Booth also were required to sign statements acknowledging this precept. (CCAC ¶ 182.) Brick and Janusek both signed Sarbanes-Oxley certifications attesting to the fairness of the financial information in the various SEC filings described in the CCAC. (CCAC ¶ 183.)

The CCAC alleges that at all relevant times, the market for Reddy Ice securities was efficient and the market for Reddy Ice securities promptly digested all available information which was publicly available and in fact entered the marketplace. (CCAC ¶¶ 186-187.) Finally, the CCAC alleges that none of the statements described in the CCAC can properly be characterized as forward-looking statements. To the extent there were any such statements, the CCAC alleges, there were no meaningful cautionary statements which accompanied them. The CCAC alleges that the safe-harbor rules, therefore, do not apply. (CCAC ¶ 188.)

## II.    STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted). Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a

defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted).

A court may also take judicial notice at the pleading stage of certain public documents, including filings in other courts of record and publicly filed disclosure documents. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001) (noting that a court may consider "the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56."); *Lyons v. Stovall*, 188 F.3d 327, 332 n. 3 (6th Cir.1999) ("[I]t is well-settled that '[f]ederal courts may take judicial notice of proceedings in other courts of record.'") (citing *Rodic,* 615 F.2d at 738); *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1275-81(11th Cir.1999) (approving practice of judicially noticing public disclosure documents filed with SEC); *Cortec Indus., Inc. v. Sum Holding LP*, 949 F.2d 42, 47 (2d Cir.1991) (holding publicly filed SEC documents may be judicially noticed under Fed. R. Evid. 201). In the context of a securities fraud case, a court may also judicially notice press releases and other publicly available media releases disseminated by a corporation containing "information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements." *In re UnumProvident,* 396 F. Supp. 2d at 876 (citing *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 617 (4th Cir.1999), *In re Copper Mountain Sec. Litig*., 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) and *In re First Union Corp. Sec. Litig*., 128 F. Supp. 2d 871, 883 (W.D.N.C. 2001)). As to any such document, a court may consider the proffered item only for the purpose of determining what statements the documents contain, not to resolve a disputed fact. *Lovelace*, 78 F.3d at 1018.

## III.    ANALYSIS

**A.      Section 10(b) and Rule 10b-5: Prohibited Conduct and Pleading Requirements**

**1.      Conduct prohibited by section 10(b) and Rule 10b-5.**

Under Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, promulgated by the Securities Exchange Commission ("SEC") under authority granted by Section 10(b) of the Securities Act of 1934, codified at 15 U.S.C. § 78j(b), it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. "Underlying the adoption of extensive disclosure requirements [of the 1934 Act] was a legislative philosophy: 'There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy.' H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934)." *Basic Inc. v. Levinson,* 485 U.S. 224, 230 (1988).   The "fundamental purpose" of the Act is to implement a "philosophy of full disclosure."   *Id.* (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477-478 (1977), quoting *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 186 (1963)).

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must allege:   (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. *City of Monroe Employees Retirement Sys. v. Bridgestone Corp*., 399 F.3d 651, 668 (6th Cir. 2005) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc)).   "In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose, two significant limitations to the general policy of disclosure."   *Id.* at 669.

"Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *In re Sofamor Danek Group, Inc*., 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  For a court to conclude that undisclosed information is immaterial, the court must find that the material withheld was "*so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance.*"  *City of Monroe*, 399 F.3d at 680 (quoting *Helwig,* 251 F.3d at 563 (emphasis in original)).

"Under Rule 10b-5, '[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'"  *In re FBR Inc. Sec. Litig*., 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) (quoting *Chiarella v. United States*, 445 U.S. 222, 234 (1980)).  A duty to affirmatively disclose may arise when there exists "an inaccurate, incomplete or misleading prior disclosure."  *City of Monroe*, 399 F.3d at 669.  Stated differently, "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading."  *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00-cv-1041, 2000 WL 1234601 at * 4 (S.D.N.Y. Aug. 31, 2000) (citing *In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 268 (2d Cir. 1993)).  A company is also obligated, once it chooses to speak on a subject, to do so fully and fairly: "Our securities laws therefore, 'require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak."  *City of Monroe*, 399 F.3d at 670 (quoting *Helwig,* 251 F.3d at 561).[3]  Electing

---

[3] *Helwig* was overruled on a different point by *Tellabs, Inc. v. Makor Issues and Rights, Ltd*., 551 U.S. 308 (2007), which held that the competing inference necessary to establish scienter need only be at least as compelling as any opposing inference and not, as was held in *Helwig*, the most plausible competing inference.  *See Frank v. Dana Corp*., 547 F.3d 564, 571 (6th Cir. 2008) (recognizing that *Helwig* was overruled in part on this ground by *Tellabs*).  *Helwig* remains good

to volunteer information imposes an obligation to do so fully and truthfully:

> The question thus is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . ., without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of [SEC] Rule 10b-5 itself: it is unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

*Id*. (quoting *Rubin v. Schottenstein*, *Zox & Dunn*, 143 F.3d 263, 267 (6th Cir. 1998) (quoting 17 C.F.R. § 240.10b-5(b)).

At the same time, an obligation to disclose is not imposed simply because information is material or "because it suggests that the corporation or its employees engaged in uncharged illegal conduct." *In re FBR*, 544 F. Supp. 2d at 353 (citing *In re Citigroup, Inc. Sec. Litig*., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing.")) However, "[w]hen a corporation does make a disclosure - whether it be voluntary or required - there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig*., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).

## 2. The heightened pleading requirements in a securities fraud case.

The essence of a § 10(b) claim sounds in fraud so the pleading standards of Federal Rule of Civil Procedure 9(b) apply. *Indiana State Dist. Council of Laborers and HOD Carriers Pension and Welfare Fund. v. Omnicare, Inc*., 583 F.3d 935, 942 (6th Cir. 2009) ("Because § 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply."); *PR Diamonds Inc. v. Chandler,* 364 F.3d 671, 681 (6th Cir. 2004). "Plaintiffs' complaint must '(1) specify the

---

law in the Sixth Circuit, however, on several other important points of law. *See, e.g. Konkol v. Diebold*, 590 F.3d 390, 399 (6th Cir. 2009) (applying the nine factors identified in *Helwig* as relevant to a determination of scienter). *See infra* discussion at section IIIC.

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Frank,* 547 F.3d at 570 (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)). At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied. *Id.*

In addition to the strictures of Federal Rule of Civil Procedure 9(b), the Private Securities Litigation Reform Act ("PSLRA") imposes additional pleading requirements in a securities fraud case:

> Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and] (2) . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Frank*, 547 F.3d at 570 (quoting 15 U.S.C. § 78u-4(b)(1), (2), adding emphasis). Thus, Plaintiff's Complaint must state with particularity the facts underlying the alleged actionable misrepresentations and the facts supporting the intent to "deceive, manipulate or defraud." *Id.* (quoting *Tellabs*, 551 U.S. at 313). In determining whether the complaint gives rise to a strong inference of scienter, the court must conduct an inquiry of the competing plausible inferences and must find scienter has been sufficiently pled as long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank*, 547 F.3d at 571.

A strong inference is one that is "more than merely 'reasonable' or 'permissible' but rather is "cogent," "persuasive," and "effective." *Id*. at 323-324.

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. The court must "consider the complaint in its entirety," and ultimately inquire "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-323 (emphasis in original).

Defendants move to dismiss the CCAC arguing: (1) that Plaintiffs have failed to adequately allege any actionable misrepresentations by Defendants because they have not shown that Defendants were aware that the underlying conduct was illegal or that Defendants had a duty to disclose the legal risks of their conduct; (2) that the CCAC fails to adequately allege facts sufficient to create a strong inference of scienter, arguing that there is no evidence that Defendants knew their conduct to be illegal at the time of the allegedly false and misleading public disclosures; (3) that the CCAC has failed to adequately plead loss causation, i.e. that the Defendants false and misleading statements, rather than the mere disclosure of the investigations into the industry standing alone, cause the Plaintiffs' financial loss; and (4) that the individual Defendants are not liable as "control persons" under section 20(a) because the CCAC fails to allege a violation of either section 10(b) or Rule 10b-5, a predicate to relief against a control person under section 20(a).

## B.     Misrepresentations or Omissions of Material Fact

The essence of Plaintiffs' claim is that Reddy Ice represented to the market throughout the class period that Reddy Ice's performance was attributable to its ability to effectively compete in

the packaged ice industry on price, quality and service when in fact Reddy Ice had entered into illegal market allocation agreements with it major competitors, Arctic Glacier and Home City, which ensured that Reddy Ice was "impervious to the normal effects of competition within the packaged ice industry." (Pls. Resp. 7.)[4] Plaintiffs allege that the true source of Reddy Ice's successes in the market were these unlawful market allocation agreements, which Reddy Ice failed to disclose to the market, which stifled competition and allowed for Reddy Ice stock to trade at artificially high prices. When the truth of these illegal agreements was ultimately disclosed, the CCAC alleges, Reddy Ice stock suffered a precipitous decline, and Plaintiffs and the class members suffered significant financial losses.

---

[4] Defendants claim that "the cornerstone of Plaintiffs' claims appears to be the 'written covenant not to compete' that Reddy entered into with Mountain Water Ice in 2001." (Defs.' Mot. 2.) Plaintiffs respond that this self-serving characterization of Plaintiffs' claims is completely without merit, that the CCAC "is not predicated on any 2001 sales transaction," which contained a covenant not to compete between Arctic Glacier and Reddy Ice's predecessor, was limited to a specific area in California and "expired years before the FBI raided Reddy Ice's headquarters and Ben Key was terminated." (Pls.' Resp. 8 n. 7; 14-15 n. 13.) In fact, this Court has already ruled that the 2001 agreement was not specifically referenced in Plaintiffs' CCAC and is not properly before the Court on this motion to dismiss on the pleadings. (*See* Opinion and Order Affirming The Magistrate Judge's February 18, 2010 Order Granting Plaintiffs' Motion To Strike (Dkt. No. 76)). Plaintiffs state that the "foundation of the Complaint [are] the undisclosed illegal market allocation agreements between and among Reddy Ice, Arctic Glacier and Home City that [were] ongoing throughout the Class Period." (Pls.' Resp. 8 n. 7.) Indeed the CCAC claims the existence of agreements which go beyond any alleged 2001 transaction with an attendant covenant not to compete. The alleged agreements referred to in the CCAC, based on the first-hand knowledge of McNulty and the corroborating testimony of confidential witnesses as well as the related government investigations and guilty pleas of Reddy Ice's alleged co-conspirators, are nationwide in scope and involve agreements to allocate entire states and regions for the express purpose of "driving up prices," which are alleged to have been ongoing throughout the class period. At this pleading stage, the Court does not inquire whether these allegations are true but simply whether they are supported by sufficient factual content and whether, if true, they suffice to state a claim. The issues presented by Defendants' preferred narrow reading of the CCAC are not properly resolved on a 12(b)(6) motion. *City of Monroe*, 399 F.3d at 672-673.

1.    **Plaintiffs have sufficiently pled the existence of an illegal market allocation agreement and have sufficiently pled that Defendants (except Booth) made materially false and misleading statements.**

Defendants rely on *In re Mirant Corp Sec. Litig.*, No. 02-cv-1467, 2009 WL 48188 at * 17 (N.D. Ga. Jan. 7, 2009) for the proposition that where a securities fraud claim is predicated on allegations of illegal conduct, "the basis for the illegality must be pled with particularity." (Defs.' Mot. 5.) Defendants then argue that Plaintiffs have failed to adequately allege that the 2001 covenant not to compete is unlawful and that Plaintiffs must show "that Defendants knew they had entered into an agreement that violated the antitrust laws based upon a detailed 'rule of reason' analysis." (Defs.' Mot. 5, 9.) The Court has already rejected Defendants' attempt to recharacterize and limit Plaintiffs' allegations to a single 2001 covenant not to compete. In fact, the CCAC alleges nationwide horizontal market allocation agreements which are a *per se* violation of the Sherman Act and are not analyzed under the rule of reason. Reddy Ice's own internal Ethics Code recognizes the inherent perniciousness of horizontal market allocation agreements. Thus, the question is not whether Plaintiffs have alleged sufficient facts to support a contention that Defendants knew that a 2001 covenant not to compete was illegal but whether Plaintiffs have adequately alleged knowledge of the existence of agreements to allocate territories and customers on a nationwide basis during the class period, and to stay out of each others territories, in violation of the antitrust laws.

As evidence of the underlying allegedly unlawful conduct, Plaintiffs rely in part on the allegations made in Mr. McNulty's whistleblower litigation that he learned, through a conversation with Mr. Corbin, Arctic Glacier's Vice President of Sales, that Arctic Glacier, Reddy Ice and Home City had agreed among themselves to allocate markets for the sales of packaged ice in the United States. Specifically, Mr. McNulty, who agreed to cooperate with the FBI in their ongoing

investigation of the packaged ice industry, states in his whistleblower complaint that Mr. Corbin informed him that Arctic Glacier's agreement not to enter the South and Southwest (where Reddy Ice was dominant) enabled Reddy Ice to get their prices up there and Reddy Ice's agreement to stay out of the Midwest and Canada enabled Arctic Glacier to do the same in those territories. (CCAC ¶¶ 44-45.)

Plaintiffs allege that these allegations are further supported by the testimony of several confidential witnesses who are former employees of Reddy Ice. Defendants argue that these confidential witness statements are non-probative hearsay, relying on the Sixth Circuit's decision in *Omnicare*, where the court rejected allegations based on the testimony of a confidential witness, concluding that the witnesses' testimony should be "steeply discounted" where the witness was identified only by the title of his position, without further foundation supporting a reasonable belief in the witness' basis of knowledge. 583 F.3d at 946. To be sure, "[t]he Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'" *In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003).

However, where the allegations of a complaint give sufficient detail about a confidential witness' position in the company such that the Court can discern the probable basis of a witness' belief, such "anonymous sources are not altogether irrelevant." *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008). In *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), the court provided a thoughtful examination of the issue of "where anonymous witnesses stand in the wake of the Supreme Court's decision [in *Tellabs*]." 564 F.3d at 261-262. In *Avaya*, the shareholder-plaintiffs alleged in part that defendants had repeatedly falsely assured the market that

the company did not face pricing pressures when in fact the competition was forcing huge price discounts that impaired profit margins. 564 F.3d at 260. The court examined whether the allegations of the complaint regarding pricing pressures, which relied primarily on the representations of confidential witnesses, sufficiently pled falsity under the PSLRA. Considering the opinions of several sister circuits post-*Tellabs*, including the Sixth Circuit's opinion in *Ley, supra*, the court in *Avaya* first noted that "all else being equal, a complaint with named sources would be better than one with confidential witnesses, but the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." 564 F.3d at 262 (internal quotation marks and citations omitted). The court concluded, in agreement with the opinion expressed by the Sixth Circuit in *Ley*, that the discount applied to confidential witness allegations "will depend in large part on the level of detail with which they are described."

In deciding whether a complaint adequately sets forth the foundation or basis of a confidential witnesses' knowledge, courts should consider "'the position(s) held, the proximity to the offending conduct and the relevant time frame.'" *Id*. (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008)). If "a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity." 564 F.3d at 263. The court in *Avaya* concluded that the shareholders had adequately pled falsity through the testimony of the confidential witnesses where the complaint described the duration of each of the witnesses' employment, the time period during which they acquired the information and how each witness had access to such information. *See also In re Marsh & Mclennan*, 501 F. Supp. 2d at 482 (considering allegations based on confidential witnesses where the complaint sufficiently described the personal sources of plaintiffs beliefs); *In re St. Paul Travelers Securities Litig. II*, No. 04-4697,

2006 WL 2735221 at * 3 n.2 (D. Minn. Sept. 25, 2006) ( allegations based upon the testimony of confidential witnesses were sufficiently particularized to support an inference that defendants participated in an allegedly unlawful bid-rigging scheme, where the complaint specified that each of the confidential witnesses worked for defendants during the class period, and explained the capacity in which they worked and the incidences they experienced). The Court can also consider "'the level of the detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Metawave*, 298 F. Supp. 2d at 1068 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002)).

Examining those allegations of the CCAC which are based upon confidential witness testimony, the Court finds that some hold a greater of indicia of reliability than others. The Court concludes, however, that collectively and viewed in light of facts alleged through other sources, the statements are sufficient to support the allegations of falsity in the instant case. Confidential witness number one (CW1) is identified by his position as "National Purchasing and Contracts Manager for Reddy Ice from mid-1997 through late-2004." (CCAC ¶ 46.) The CCAC further alleges that CW1 was based out of the Reddy Ice headquarters in Dallas, Texas and "became aware of the unlawful market allocation agreement between Reddy Ice and Arctic Glacier." CW1 stated that it was discussed in his presence and in the presence of other Reddy Ice employees that "Reddy Ice had agreed to not compete against Arctic Glacier in California, and that Arctic Glacier in exchange had . . . agreed to 'stay out' of Arizona." (CCAC ¶ 46.) However, the CCAC does not state who made the statements that were discussed in CW1's "presence" and the Court cannot discern whether this may have been "water cooler talk" or statements made by senior executives. Nor does the CCAC

explain how CW1's position gave him special access to such information. The Court cannot readily discern the basis for CW1's personal knowledge and must "steeply discount" the allegations based upon the testimony of CW1. *See Metawave*, 298 F. Supp. 2d at 1069 (finding insufficient basis for the testimony of CW5 where CW5 stated that he "learned" that there were many unsold GSM products in distributors' warehouses but failed to state from whom or how he learned, finding that therefore CW5's knowledge, based on hearsay, could not be imputed to the individual defendants).

CW2, on the other hand, is described as having held three positions with Reddy Ice during the class period, each of which gave him access to "highly-sensitive financial information related to the Company's financial performance and business practices." (CCAC ¶47.) CW2 traveled regularly to the Company's plants to perform internal audits and learned of the alleged market allocation agreement from discussions with employees at the corporate office and at the plants and was also "personally told of the unlawful agreement by Defendant Weaver." (CCAC ¶ 48.) CW2 learned of the details of the alleged market allocation agreement from "several Reddy Ice employees" and also heard the plan discussed at an annual plant mangers meeting in a presentation by Defendant Weaver in the presence several management attendees, including Defendant Janusek. (CCAC ¶¶ 49-51.) CW2 describes the details of the alleged agreement and also is alleged to have gained "first-hand knowledge that defendants Weaver and Janusek" knew that the market allocation agreement included Home City. (CCAC ¶ 52.) The Court finds that the foundation for CW2's knowledge of the allegations attributed to him is sufficiently pled.

CW3 is a former Reddy Ice Internal Audit Manager who was employed prior to and during the class period, from June 2005 to July 2008, and was responsible for overseeing Reddy Ice internal audits and Sarbanes-Oxley certification, and "for reporting highly-sensitive information about the

Company's financial performance to Reddy Ice's audit committee." (CCAC ¶ 54.) The CCAC alleges that CW3 gained knowledge of Reddy Ice's decision to "pull out of the California packaged ice market" and move into Arizona through his audit responsibilities. (CCAC ¶ 55.) According to CW3, Defendants Janusek and Brick, along with Nancy Green, Reddy Ice's Vice President of Compliance and Ben Key, the suspended Reddy Ice Vice President of Sales and Marketing, attended a meeting with Arctic Glacier in 2006. CW3 was told "by other Reddy Ice employees" that the purpose of the meeting was "to discuss Arctic Glacier's purchase of the consortium that previously purchased the majority of Reddy Ice's California manufacturing operations." While the Court finds that the CCAC alleges sufficient foundation for CW3's knowledge that Reddy Ice allegedly pulled out of California and agreed to purchase a manufacturing plant in Arizona, and that the above-mentioned individuals attended a meeting together in 2006, the basis for CW3's knowledge of the alleged purpose of that meeting cannot be discerned from the allegations of the CCAC. Thus, the Court discounts the allegations of the CCAC that are based upon this aspect of CW3's testimony.

CW4 is a former plant manager for one of Reddy Ice's large manufacturing facilities in Arizona who was employed during the class period from mid-2007 through late-2008. (CCAC ¶ 57.) Like CW1, CW4's knowledge is alleged to have been gained from "other Reddy Ice employees" and "co-workers." The Court finds that there is insufficient basis set forth in the CCAC to provide the foundation for CW4's testimony.

Viewing the totality of the allegations of the CCAC based on the testimony of CW2 and CW3, along with the corroborating allegations in the McNulty complaint, and considering this Court's prior determination that a plausible antitrust claim had been stated against Reddy Ice, Arctic Glacier and Home City in the related multi-district antitrust litigation, the ongoing DOJ

investigations, the Reddy Ice internal investigations and suspension of Ben Key for activities violating company policy and related to the DOJ investigation, the Court finds that the CCAC adequately pleads the underlying illegality of the alleged market allocation agreements. Defendants rely heavily on *In re Mirant* but the Court finds that case, where plaintiffs' complaint provided "no legal basis to support the premise that Mirant violated state of federal law," distinguishable. 2009 WL 48188 at 19. The court in *In re Mirant* found that plaintiffs had completely failed even "to articulate a clear theory of illegality underlying their purported claims of market manipulation," and expressly distinguished a case, like the instant case, where Plaintiffs allege conduct that violates federal antitrust law. *Id.* The court expressly distinguished *In Re Sotheby's, supra*, where the court concluded that "plaintiffs had adequately alleged securities fraud premised on failure to disclose illegal price-fixing agreements that allegedly violated federal antitrust laws." *Id.* The Court concludes that the CCAC adequately pleads, with sufficient particularity, the basis for the underlying illegality of the alleged market allocation agreement.

The CCAC further alleges that, despite the existence of the purported illegal market allocation agreements, Reddy Ice made multiple misrepresentations in its public filings, and in other communications to the investing public, that Reddy Ice's success in the market was solely attributable to its superior ability to compete on price and quality and other legitimate competitive factors. *See supra* discussion at pp. 12-14. The CCAC further alleges that Reddy Ice also repeatedly stated in its public filings and communications that it understood the illegal nature of such market allocation agreements and that at all times Reddy Ice operated in compliance with all antitrust laws that prohibit such behavior. *See id.* The Court concludes that the CCAC sufficiently pleads that Defendants (except Booth) made materially false and misleading statements

## 2. Defendants (except Booth) had a duty to disclose to the market the allegedly unlawful market allocation agreements.

The two significant limitations on the general obligation of disclosure are that the misrepresentation or omission be material and that the defendant have a duty to disclose the material fact if it is omitted. *City of Monroe*, 399 F.3d at 669. A fact is material if a reasonable investor would have considered it as having a significant impact on the "total mix" of available investment information. *In re Sofamor*, 123 F.3d at 400. In order for the Court to conclude that facts omitted were immaterial, it must conclude that the material is so obviously unimportant that reasonable investors could not differ on the question of its importance." *City of Monroe*, 399 F.3d at 680. However, materiality alone is not sufficient to impose a duty to disclose. *Zaluski*, 527 F.3d at 572. Thus, even though reasonable minds might all agree that an investor in Reddy Ice shares during the class period would have considered highly significant the information that Reddy Ice had agreed with its major competitors to divvy up markets in violation of the antitrust laws, liability for failing to disclose that fact will not attach unless Defendants were under a duty to disclose to the public the alleged market allocation agreements.[5]

---

[5] Defendants allege, in an argument that this Court previously declined to consider because it presented matters outside the pleadings, that Reddy Ice disclosed the "covenant not to compete" in multiple public filings and argue that therefore any misrepresentations about this fact, which was already known to the investing public, are not actionable. *See City of Monroe*, 399 F.3d at 675. However, as the court noted in *City of Monroe*, "in an open and efficient market 'information important to a reasonable investor is immediately incorporated into stock prices.'" *Id*. at 676 (quoting *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1425 (3d Cir. 1997)). It was not until after disclosures beginning on March 5, 2008 with the execution of the search warrant on Reddy Ice that Reddy Ice stock prices began to reflect the information being disseminated. This drop in share price so closely related in time to the emergence of the investigations into alleged market allocation agreements and the subsequent suspension of Ben Key would lead a reasonable juror to conclude that the market had not previously received the true facts related to competition in the packaged ice industry. *See City of Monroe*, 399 F.3d at 676.

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *In re Sofamor*, 123 F.3d at 400. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Limitations on the duty to disclose are necessary because "corporations might otherwise face potential second-guessing in a subsequent disclosure suit, a regime that would threaten to deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." *City of Monroe*, 399 F.3d at 669 (internal quotation marks and citations omitted).

Generally, "there is no duty to disclose 'soft information' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions." *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *Sofamor*, 123 F.3d at 402). However, it is equally well accepted that "[o]pinions cease to be soft information [] when contradicted by actual knowledge of wrongdoing." *Id.* Moreover, a duty to speak may arise where a disclosure is necessary to prevent another statement from misleading the public. This conclusion is based upon the precept, recognized by the Sixth Circuit in *Rubin* and reiterated in *Helwig* and *City of Monroe*, that "the question is not whether silence can give rise to liability" but whether liability "may flow from the decision to speak." *Rubin*, 143 F.3d at 268. "Even absent a duty to speak, a party who voluntarily discloses material facts in connection with a securities transaction assumes a duty to speak fully and truthfully on those subjects." *Helwig*, 251 F.3d at 561. Thus, if a complaint adequately alleges that the defendants knew of the illegal nature of their conduct at the time they made the allegedly material misstatement, courts will impose a duty of disclosure.

Defendants argue that they were not obligated to disclose any opinions they may have

possessed regarding the potential illegality of any alleged market allocation agreement. (Defs.' Mot. 8.) Defendants rely principally on the Sixth Circuit's statement in dicta in *Omnicare* that "predictions regarding the actions of third parties, particularly whether fines or other sanctions would be brought based on findings of regulatory violations" constitute "soft" information which defendants were not obligated to disclose. 583 F.3d at 947. What Defendants fail to discuss in their reliance on *Omnicare* is the court's prior important finding that there were no sufficiently pled allegations that the defendants knew that their drug-handling practices were illegal. The Sixth Circuit in *Omnicare* discussed at length the Eighth Circuit's opinion in *Kushner, supra*, and applied that court's assumption that liability for an alleged misstatement can only attach where the complaint "adequately pleaded that the defendants knew the statements were untruthful." 583 F.3d at 945. In *Omnicare*, the court found that the complaint failed to specifically allege such knowledge and therefore refused to impose a duty to disclose what remained "soft" information regarding potential regulatory enforcement. "In sum, the complaint does not sufficiently establish that the defendants actually knew that the 'legal compliance' statements were false when made." *Id.* at 947. While the mere specter of possible but uncertain regulatory enforcement does not impose a duty to disclose, knowledge of the illegality of the allegedly unlawful conduct does. Sufficient allegations of such "knowledge" renders "soft" information more in the nature of a hard, objectively verifiable fact and as such subject to the duty of disclosure.

Thus, when choosing to speak on a subject, the obligation to do so fully and truthfully requires disclosure of unlawful conduct which otherwise might not be subject to disclosure where plaintiffs sufficiently allege that defendants possessed knowledge of the illegality of their behavior. *See In re UnumProvident Corp. Securities Litig.*, 396 F. Supp. 2d at 887 (rejecting defendants'

argument that they were not obligated under the federal securities laws to confess publicly to some unlawful claims practice that could adversely affect their business, and finding a duty to disclose the allegedly illegal behavior, reasoning that while "materiality alone is not sufficient to place a company under a duty of disclosure, as a general matter the laws should be interpreted so as to thwart fraud and deceit. The fact of one fraud should not operate to legally sanction the perpetration or concealment of another.") *See also In re Par Pharm. Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose. . . . The fact that a defendant's act may be a crime does not justify its concealment.")

While materiality alone does not obligate a corporation to accuse itself of wrongdoing, a duty to disclose uncharged illegal conduct will arise "when disclosure is necessary to prevent another statement from misleading the public." *Menkes v. Stolt-Nielsen S.A.*, No. 03-cv-409, 2005 WL 3050970 at * 6 (Nov. 10, 2005) (citing *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 (1st Cir. 1987)). "A duty to disclose uncharged illegal conduct arises . . . when it is necessary to disclose the conduct in order to prevent statements the corporation does make from misleading the public." 2005 WL at * 7. "A statement regarding financial performance, even when accurate, is still misleading under the securities laws if the speaker attributes the performance to the wrong source." *City of Roseville Employee's Retirement Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010) (finding materially false and misleading statements where defendants attributed financial success to purely business practices and failed to mention that revenue growth and rate increases were driven in large part by a price-fixing conspiracy although concluding that the complaint failed to adequately allege scienter on the part of the individual defendants).

Thus, where corporate officers choose to speak they are obligated to disclose the truth and to make any additional disclosures necessary to avoid making both present and prior statements misleading. *In re Par Pharm*, 773 F. Supp. at 675. This duty will be imposed only where "the subject matter of the statement is sufficiently connected to the undisclosed misconduct." *In re Marsh Mclennan*, 501 F. Supp. 2d at 471 (citing *In re Par Pharm*, 733 F. Supp at 678 and *Menkes*, 2005 WL 3050970 at * 7-8). *See also In re St. Paul Travelers,* 2006 WL 2735221 at * 4 (failure to disclose illegal bid-rigging as true source of company's growth and revenues actionable); *In re Sotheby's*, 2000 WL 1234601 at * 4 (denying motion to dismiss claims predicated on an alleged anticompetitive agreement which defendants had a duty to disclose where the corporation affirmatively stated that it competed intensely with its primary competitor); *In re Par Pharm*, 733 F. Supp. at 677-678 (denying motion to dismiss claims based upon failure to disclose fraudulent scheme to obtain speedy new drug approvals where defendants affirmatively stated that its success was due to a certain expertise that gave it an edge over rivals); *In re Micron Technologies, Inc. Sec. Litig.*, No. 06-085, 2007 WL 576468 at * 7 (D. Idaho Feb. 21, 2007) (allegations sufficiently pled falsity where the company explained pricing as a product of market factors when in fact pricing was directly related to the underlying alleged price-fixing scheme); *Menkes v. Stolt-Nielsen*, No. 03-cv-409, 2006 WL 1699603 at * 8 (D. Conn. June 19, 2006) (material falsity pled where complaint alleged pervasive anticompetitive activity and alleged that company deceived the investing public by stating that business success had been achieved in a competitive environment).

The CCAC adequately pleads that Defendants knew, as evidenced by their Ethics Code, that market allocation agreements were of the most pernicious sort of antitrust violations and adequately alleges that, notwithstanding this knowledge, they entered into such market division agreements with

their major competitors for the express prohibited anti-competitive purpose of driving up prices. This satisfies the pleading requirement that a complaint adequately allege that the defendants knew that their statements were untruthful. The CCAC also adequately alleges that Defendants made express representations to the contrary in multiple public filings, specifically and repeatedly stating that their market share and earnings were the result of their ability to compete on price, service and quality in a "highly competitive" packaged ice industry. Thus, the CCAC alleges a direct nexus between the allegedly illegal conduct and the Defendants' allegedly materially false and misleading statements. *Omnicare*, *Helwig* and *Zaluski* require nothing more.

The facts as alleged in the CCAC fit squarely within the parameters of adequacy discussed by the courts in *In re Par Pharm*, *In re St. Paul Travelers* and *Menkes.* The Sixth Circuit reiterated in *City of Monroe* the legislative philosophy underlying adoption of the disclosure requirements of the 1934 Act: "'There cannot be honest markets without honest publicity' because '[m]anipulation and dishonest practices of the market place thrive upon mystery and secrecy.'" 399 F.3d at 668 (quoting *Helwig*, 251 F.3d at 556 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (quoting H.R. Rep. No. 1383, at 11 (1934))). Plaintiffs have alleged sufficient facts in the CCAC that, if proved, would certainly implicate this fundamental principle of the securities laws. The Court concludes that the CCAC adequately alleges that Defendants had a duty and failed to disclose material information.

## C.     Scienter

The PSLRA requires that, in addition to adequately alleging a false and misleading statement or omission, a securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

"Scienter," the "required state of mind," is defined as "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319. "[A] plaintiff may survive a motion to dismiss by pleading with particularity facts giving rise to a strong inference that the defendant acted with knowledge or recklessness." *PR Diamonds*, 364 F.3d at 682. The Court must evaluate competing non-culpable inferences supporting the alleged material misstatement or omission and must allow the claim to proceed if two competing inferences are equally compelling. *Id.* at 324. *Tellabs* dictates that a draw on the issue of inference goes toward a finding of scienter. Finally, it is well accepted that "[t]he scienter of senior executives can be imputed to the corporate defendants." *In re St. Paul Travelers*, 2006 WL 2735221 at * 4 n. 3.

Allegations that a defendant engaged in "deliberately illegal behavior" can give rise to a strong inference of scienter. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior.") *See also In re Sotheby's*, 2000 WL 1234601 at * 6 ("A plaintiff may sufficiently plead conscious misbehavior through allegations of deliberate illegal conduct."); *In re Intelligroup Sec. Litig.,* 527 F. Supp. 2d 262, 284 (D.N.J. 2007) (recognizing that a strong inference of scienter will arise if the complaint sufficiently alleges that the defendants engaged in illegal behavior); *Kushner*, 317 F.3d at 827 (same). This Court concluded above, in section IIIB1, that the CCAC adequately pleads Defendants' knowledge of the illegality of their market allocation behavior and therefore the Court further concludes that a strong inference of scienter derives from that finding.

Additionally, even were the Court to conclude that the CCAC insufficiently pleads that the Defendants had actual knowledge of their illegal behavior, the CCAC adequately pleads a strong inference of scienter based upon a finding of recklessness. The Sixth Circuit has defined

recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Helwig*, 251 F.3d at 550. The Sixth Circuit has identified several factors as "helpful" but not exhaustive in determining whether the allegations of a complaint adequately plead scienter, which include: insider trading at a suspicious time or in an unusual amount; divergence between internal reports and external statements on the same subject; closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; disregard of the most current factual information before making statements; self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552.

"'Insider trading at a suspicious time or in an unusual amount' comprises one of the 'fixed constellations of facts that courts have found probative of securities fraud.'" *PR Diamonds*, 364 F.3d at 691 (quoting *Helwig*, 251 F.3d at 552). While the CCAC alleges the amounts, dates and number of shares sold by the individual Defendants, it does not specifically allege in what manner these sales were "suspicious" or "in an unusual amount." *See Konkol,* 590 F.3d at 399 (6th Cir. 2010) ("'[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period.'" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009)). "Courts should not 'infer fraudulent intent from the mere fact that some officers sold stock ... Instead, [p]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter.'" *In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 737-738 (S.D. Ohio 2008) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir.1997)). "Courts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were "normal or routine" for the insider;

(2) whether profits reaped were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious." *In re Cardinal Health*, 426 F. Supp. 2d at 728 (internal quotation marks and citations omitted). The CCAC does not provide historical or other comparative data and therefore fails to adequately allege facts that would support a finding that these trades were suspicious or in an unusual amount.

The CCAC alleges that the individual Defendants' compensation packages also support an inference of scienter. "[T]he magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud." *In re Cardinal Health,* 426 F. Supp. 2d at 737-738. The CCAC alleges that during the class period, Brick and Janusek almost doubled their compensation with performance based incentive pay ($3.5 million and $1.6 million respectively). (CCAC ¶ 172.) While this allegation, standing alone, may not create a strong inference of scienter, "the Court may consider [Defendants'] motivation to keep [Reddy Ice] stock price high in order to profit from their executive compensation packages in analyzing scienter." *Id*. at 738.

Plaintiffs argue that an inference of scienter is further supported by the divergence between Defendants' internal conduct (increasing revenues and growth by engaging in anticompetitive behavior by dividing up the market for packaged ice) and their external statements (attributing increased revenues and growth to competition based on price, quality and service in a "highly competitive" packaged ice industry and professing to comply with the antitrust laws and particularly to not agree with competitors to allocate customers or markets). "Securities fraud claims typically

have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge or access to information contradicting their public statements." *Menkes*, 2006 WL 1699603 at * 4. The CCAC sufficiently alleges that, at the very least, Defendants Brick and Janusek were seriously reckless in representing to the investing public that their growth and revenues were the result of legitimate competitive behavior when, according to the allegations of the CCAC, they had actual knowledge, or at the very least were reckless not to have known, of agreements with competitors to geographically divide markets in the packaged ice industry. Similarly, Reddy Ice's express disavowals of participation in any agreements with competitors to divide customers or territories, while simultaneously allegedly agreeing with competitors to do just that, supports an inference of scienter. Additionally, Reddy Ice's suspension of Ben Key, a high level executive, just six months after their steadfast public statements regarding the Company's strict adherence to laws prohibiting market allocation supports, an inference of scienter.

In determining the existence of scienter, the Sixth Circuit "employs a totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness." *PR Diamonds*, 364 F.3d at 683. The facts of the CCAC, taken as a whole, strongly suggest that top Reddy Ice executives, including, Brick and Janusek, knew or at the very least recklessly disregarded the fact that their public statements touting their market share and revenues as the result of competition on the basis of price, quality and service in a "highly competitive" packaged ice industry, and their statements pledging strict adherence to laws that prohibit market allocation agreements, were false and misleading.[6] Both Brick and Janusek

---

[6] The Court also infers scienter from Brick and Janusek's Sarbanes-Oxley ("SOX") certifications, which state in part that, based on their knowledge, the Form 10-Q report does not contain any material misrepresentations or omit any material fact otherwise necessary to make the other

acknowledged by signing the Ethics Code that "some of the most serious antitrust offenses occur between competitors [who agree] . . . to divide customers, territories or markets."[7]  (CCAC ¶ 31.) Yet this is precisely what the CCAC alleges that these Defendants did.

Specifically, the CCAC alleges that Brick and Janusek knew that Reddy Ice had agreed with competitors to divide up territories and to "stay out of each other's way" in the market for packaged ice.  The CCAC alleges, based on the sufficiently pled testimony of CW2, that Brick approached the CEO of Arctic Glacier to "divvy up" the California and Arizona markets along with certain Midwest states in which Reddy Ice operated.  (CCAC ¶¶ 49-52.)  The CCAC also alleges, based on the testimony of CW2, that Brick "brokered the straw-man agreement" through which Reddy Ice agreed to allocate territories with Arctic Glacier after the California purchase.  (CCAC ¶ 53, 181.)  With respect to Defendant Janusek, the CCAC alleges, based on the testimony of CW2, that Janusek was in attendance at a meeting in 2006 or 2007 where one subject of discussion was the agreement to geographically divide territories with Arctic Glacier.  (CCAC ¶ 51.)  Moreover, the CCAC alleges

---

disclosures not misleading.  (CCAC ¶ 76.)  An inference of scienter from these certifications is appropriate where, as here, "the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous."  *In re Intelligroup,* 527 F. Supp. 2d at 290.  *See also Grillo v. Temper-Pedic Int'l Inc.*, 553 F. Supp. 2d 809, 819 (E.D. Ky. 2008) (finding that SOX certifications are only probative of scienter if the person signing was seriously reckless in certifying the truth and fairness of the financial statements).

[7]  The Court acknowledges that generally a company's "code of ethics," which is "essentially mandatory" under SEC regulations, is thought to be "inherently aspirational" and unable, standing alone, to support an inference of scienter.  *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685-686 (D. Colo. 2007).  However, the Reddy Ice Ethics Code, which Brick attests to having "carefully studied," specifically acknowledges the inherent illegality of market division agreements and expressly disavows participation in such pacts.  The Court finds this particular Ethics Code is a factor to consider in determining whether the CCAC adequately pleads facts supporting a strong inference of scienter.

that even after the March 5, 2008 execution of a search warrant on its headquarters, and its own internal investigation, Reddy Ice executives continued to conceal the market allocation agreements, continued to deny any improprieties and continued to materially mislead investors, stating in the Reddy Ice 2007 Form 10-K that "Senior Management is not aware that the Company has engaged in anticompetitive behavior, or other activities, that violate the antitrust laws." (CCAC ¶ 129.) These allegations, if proven, are sufficient to establish that Brick and Janusek knew, or at least recklessly disregarded, the true facts underlying Reddy Ice's success in the packaged ice market and materially misstated those facts in its public disclosures. While Reddy Ice attempts to dismiss the allegations of the CCAC as relating solely and innocently to a 2001 covenant not to compete, the Court has already declined to accept, at the pleading stage, this "spin" on the allegations of the CCAC, which in fact are much broader in scope and are sufficiently pled to withstand the instant motion to dismiss. *See In re Sotheby's*, 2000 WL 1234601 at * 8 (finding scienter adequately pled as to Taubman and Brooks, both of whom were alleged to have been directly involved in a price-fixing conspiracy and both of whom signed 10-Ks that, in light of the illegal agreement, they knew were false and misleading). *See also Menkes*, 2006 WL 1699603 at * 5-6 (allegations that corporate executives reached an agreement that certain customers belonged to certain companies – that they had "carved up the world" – were sufficient to plead scienter under the PSLRA where public statements referenced corporate success based on significant competition in the marketplace).

The Court views these allegations together with the following general allegations of the CCAC, to conclude that the CCAC adequately alleges scienter on the part of Brick and Janusek, which is attributable to Reddy Ice: (1) the additional allegations of the CCAC regarding the DOJ

investigations of Reddy Ice and the packaged ice industry,[8] (2) Arctic Glacier and Home City guilty

pleas to illegal market allocation in Southeastern Michigan, the same competitors with whom Reddy

Ice is alleged to have entered into similar agreements in other geographic markets, (3) the proposed

settlement agreement between plaintiffs in the antitrust action and Home City, in which Home City

agrees to provide significant cooperation to plaintiffs by providing evidence in support of a

nationwide conspiracy among Arctic Glacier, Reddy Ice and Home City, (4) the allegations of the

McNulty complaint alleging first hand knowledge, based upon a conversation with a top executive

of Arctic Glacier, of the existence of nationwide market allocation among Reddy Ice, Arctic Glacier

and Home City, (5) the finding of this Court that direct purchaser plaintiffs in the related antitrust

action have plausibly stated a claim against Reddy Ice, Arctic Glacier and Home City for violation

of the antitrust laws predicated on alleged market allocation agreements.

The Court concludes that the CCAC contains sufficiently particularized factual allegations

---

[8] The existence of such investigations is not sufficient, standing alone, to support a strong inference of scienter but is not irrelevant to the analysis. *Konkol*, 590 F.3d at 402 (6th Cir. 2010) ("Although a government investigation is not altogether irrelevant to the scienter analysis, a decision by government agencies to investigate a company is not sufficient to meet the heightened *Tellabs* standard on its own . . . ."). Additionally, as it did in *In re Packaged Ice*, __ F. Supp. 2d __, 2010 WL 2671306 at * 15, this Court declines to attach significance, in favor of or against either party, to statements made in the related criminal proceedings about the scope of the government investigation, which in any event result in a neutral stance on the part of the government as to these civil proceedings. *Id.*

On a related note, the Court will grant Defendants Reddy Ice, Brick and Janusek's motion to supplement their motion to dismiss and considers the statement, contained in Reddy Ice's Form 8-K filed with the SEC on October 29, 2010 and November 1, 2010, that Reddy Ice has issued a press release announcing that its counsel has been notified by the Antitrust Division of the Department of Justice that the DOJ will take no action against Reddy or its employees in connection with the DOJ's criminal investigation of the packaged ice industry. (Dkt. No. 82.) The Court declines, as discussed above, to attach undue significance to any decision of the government to circumscribe its criminal investigation. The Court also notes the lesser standard of proof required in this civil matter.

to support a strong inference that Defendants Brick and Janusek "knew or were seriously reckless in not knowing that the Company was operating under the terms of widespread illegal antitrust agreements and knowingly and recklessly failed to disclose the agreements or related risks to investors during the Class Period." (CCAC ¶ 179.) The Court further concludes that a reasonable investor would consider this inference at least as plausible as the only opposing inference offered by Defendants, i.e. that Reddy Ice was engaged in lawful competition pursuant to an expired covenant not to compete in a discrete area of California. Even if this Court were to credit Defendants' non-culpable inference with equal plausibility, *Tellabs* instructs that Plaintiffs win that draw and the CCAC should still move forward. *Frank*, 547 F.3d at 571. In any event, the Court is more strongly inclined to agree with Plaintiffs that, if this entire matter could have been settled with reference to a lawful non-compete, the FBI and DOJ would not be conducting nationwide investigations of Reddy Ice and its major competitors in the packaged ice industry, Reddy Ice would not have suspended Ben Key for violating company policy with respect to the antitrust matters under investigation by the DOJ, and numerous state attorneys' general would not be conducting parallel antitrust investigations, and this Court would not have found, in a related antitrust case, that plaintiffs there had plausibly alleged that Reddy Ice, Arctic Glacier and Home City (which now has agreed to settle and to provide evidence of a nationwide conspiracy against Reddy Ice and Arctic Glacier) agreed to allocate markets in the packaged ice industry. The Court concludes that the CCAC adequately alleges scienter on the part of Brick, Janusek and Reddy Ice.

**D.    Loss Causation**

"In a securities action, the plaintiff bears the burden of proving loss causation, 15 U.S.C. § 78u-4(b)(4), as well as pleading it." *Omnicare*, 583 F.3d at 944 (citing *Dura Pharmaceuticals, Inc.*

*v. Broudo*, 544 U.S. 336, 346-48 (2005)). "Loss causation requires 'a causal connection between the material misrepresentation and the loss.'" *Id*. (quoting *Brown v. Earthboard Sports USA, Inc*., 481 F.3d 901, 920 (6th Cir. 2007) (quoting *Dura,* 544 U.S. at 342). "Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *Id.* (citing *Dura*, 544 U.S. at 346-47). Defendants argue that *Dura* instructs that loss causation cannot be established unless a corporation actually admits that a prior statement was actually false. (Defs.' Reply to Mot. Dismiss, 5.) The Court declines to read *Dura* so narrowly.

Plaintiffs in *Dura* alleged that they relied on misrepresentations about expected FDA approval of an asthmatic spray device when purchasing Dura stock. 544 U.S. at 338. Plaintiffs alleged that about eight months later, the FDA announced that it would not approve the Dura device. *Id*. at 339. The next day Dura's share price fell but almost fully recovered within one week. *Id*. Plaintiffs alleged only that in reliance on "the integrity of the market" they paid "artificially inflated prices for Dura securities" and "suffered damage[s] thereby." *Id*. at 340 (emphasis omitted). Relying on the common-law principle of proximate cause, the Court concluded that plaintiffs failed to allege an economic loss attributable to the misrepresentation and therefore failed to establish loss causation under the securities laws. *Id*. at 346. The Court held that plaintiffs' failure "to claim that Dura's share price fell significantly after the truth became known" precluded recovery under the PSLRA. The Court reasoned that at the time of purchase, the stock was worth what plaintiffs paid for it, whether artificially inflated or not and plaintiffs at this point had suffered no loss. If the stock is later sold for the same price or more, then any misrepresentation has not caused an economic loss. *Id.* at 342-343. If the stock is later sold for a lower price, such loss may or may not be fairly

attributable to the earlier misrepresentation. Because plaintiffs failed in *Dura* even to allege that Dura's stock lost value after the FDA announcement, the complaint insufficiently pled loss causation. *Id*. at 348. Recognizing that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff," the Court concluded that nonetheless, a plaintiff must at least "provide defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347.

Plaintiffs in the CCAC do not just allege purchase price inflation and the CCAC gives Defendants adequate notice that Plaintiffs claim that the decline in Reddy Ice stock was causally related to Reddy Ice's alleged material misrepresentations regarding competition in the packaged ice industry and compliance with the antitrust laws. Here the CCAC alleges what was missing in *Dura*. Plaintiffs allege in the CCAC not only that the price of Reddy Ice stock was artificially inflated by the misrepresentations but explains in detail the corresponding stock price decreases directly related to each additional announcement, each disclosure further exposing Reddy Ice's connection to the alleged market allocation agreements and causing a further correction to the inflated stock price. Defendants urge the Court to read *Dura* as requiring an admission by the Defendants of illegal wrongdoing, and a revelation that their prior statements were actually false, before loss causation can be pled. The Court declines, as several courts have, to read *Dura* so narrowly. *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (holding that revelation of an SEC investigation relating to the very statements that plaintiffs alleged were misleading was a sufficient disclosure even though not an admission by the company, further holding that "*Dura* does not require that a corrective disclosure precede a stock's decline," relying on the Supreme Court's reference in *Dura* to a stock's initial inflation "before the relevant truth

begins to leak out " and "after the truth makes its way into the market place," implying that something less than full corrective disclosure can satisfy the pleading standard); *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("[R]eading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures. Several District Courts have, therefore, read Dura narrowly, and this Court finds their reasoning persuasive."); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (finding that plaintiffs' allegations that defendant's improper accounting practices artificially inflated the stock price adequately pled loss causation where the allegations, if assumed to be true, were sufficient to apprise defendant that the drop in stock price was alleged to have been causally related to the allegedly improper accounting practices, indicating also that allegations that public statements or disclosures challenging defendant's accounting practices which immediately preceded the stock price drop would be notable disclosures); *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 WL 2007004 at * 20, 22 (D.N.J. August 17, 2005) (rejecting any notion that "an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud," and holding that a disclosure need only "touch upon" the alleged fraud to satisfy the loss causation pleading standard); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (to satisfy loss causation under *Dura*, revelations of the "truth" need not take the form of a single, unitary disclosure and plaintiff need only allege "'that his losses were attributable to *some form of revelation* to the market of the wrongfully concealed information.'") (quoting *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 23319118 at * 23 (S.D.N.Y. Sept. 21, 2005)) (emphasis in original); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 306 (S.D.N.Y. 2005) (corrective disclosures are not essential to alleging loss causation where "plaintiffs allege that the subject of the misrepresentations and omissions

caused their loss"); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 265-266 (S.D.N.Y. 2005) (to establish loss causation, plaintiff must allege a disclosure and allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security); *In re St. Paul Travelers*, 2006 WL 2735221 at * 4 (finding that the *Dura* pleading requirements were satisfied by allegations that the New York attorney general complaint referenced defendant's possible involvement in an industry-wide cartel and that the company's stock thereafter declined); *In re Cardinal Health*, 426 F. Supp. 2d at 760 ("[W]here the Plaintiffs allege that the subject of the misrepresentations and omissions caused their losses, they need not specify "corrective disclosures" causing the decline in stock value.").

Defendants rely principally on *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880 (N.D. Cal. 2008), *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007), *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214 (E.D. Wa. 2005) and *Omnicare, supra*, to support their argument that the CCAC does not adequately allege loss causation. These cases, however, do not compel such a conclusion. In both *Hansen* and *Rudolph*, the courts based their conclusions on the fact that the disclosures on which plaintiffs relied were merely investigations, which in *Hansen* expressly stated that it was not to be construed as evidence of wrongdoing, and in neither case was the "investigation" followed by a company disclosure that one of its top executives had been suspended for violating company policy relating to the very subject of the disclosure. 527 F. Supp. 2d at 1162. Additionally, in *Rudolph*, as to the company's internal July 24, 2007 disclosure, which stated that a preliminary review of equity practices required a restatement of compensation, the court found that this disclosure, although preliminary, was definitive enough to satisfy the *Dura* pleading standard. 560 F. Supp. 2d at 888-889. In *Avista*, the court held that an announcement of a regulatory authority

that it intends to commence an investigation, standing alone, was not a sufficient corrective disclosure to provide the causal relationship between Avista's failure to disclose and plaintiffs' alleged economic loss. 415 F. Supp. 2d at 1221. The court held that this was not enough of a revelation of the alleged fraud to support a causal link, and that plaintiffs were required to plead "a significant stock price decline immediately following the announcement that reveals the fraud to the public." The CCAC in the instant case pleads much more than an announcement by a regulatory body of an investigation and pleads the requisite stock decline.

In *Omnicare*, on which Defendants also rely on the issue of loss causation, the Sixth Circuit touched upon the issue of loss causation with respect to two different allegations. Citing *Dura*, the court began with the premise that an allegation of price inflation, standing alone, is insufficient and held that plaintiff must show that an economic loss occurred after the truth behind an omission became known to the market. 583 F.3d at 944. Without stating what quantum or quality of "correction" might be required in general, the court first rejected plaintiffs' argument that loss causation could be predicated on a fragment of a sentence buried in a press release authored by someone other than the defendant that did not directly address the alleged facts that plaintiffs claim defendant misrepresented. The court next rejected plaintiffs' claims of misrepresentation based on non-compliance with GAAP rules because the complaint "nowhere suggest[ed] how or when any of these alleged accounting improprieties were disclosed." 583 F.3d at 945. The court concluded that "[t]o plead loss causation, the plaintiff must allege that it was the very fact about which the defendant lied which caused its injuries.'" 583 F.3d at 945 (quoting *Tricontinental Indus., Ltd. V. Pricewaterhouse Coopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007)).

In the instant case, the CCAC specifically relies on three disclosure statements to support

the allegation of loss causation. The CCAC alleges that as a direct result of the disclosures on March 6, 2008, August 7, 2008 and September 15, 2008, Reddy Ice shares suffered material statistically significant losses, as these disclosures caused the prior artificial inflation of the share price, which had been based on Reddy Ice's material misrepresentations regarding competition and compliance with the antitrust laws, to drop out of the price. (CCAC ¶¶ 159-165.) Plaintiffs allege that on March 6, 2008, when the DOJ investigation of Reddy Ice was announced, Reddy Ice shares were trading at $23.11 (notably not the class high of $31 per share (CCAC ¶ 160)) and fell the next day, on unusually heavy trading volume, to $15.38, a decline of $7.73 per share. (CCAC ¶128, 161.) On August 7, 2008, after publication of McNulty's story in the Wall Street Journal exposing a nationwide market allocation agreement among Reddy Ice, Arctic Glacier and Home City, Reddy Ice shares fell to $10.99 per share, a drop of $2.40 per share from the prior day, again on unusually heavy trading volume. (CCAC ¶ 146, 162.) On September 16, 2008, the day after Reddy Ice announced the suspension of Ben Key for "likely violating" company policy and being associated with matters under investigation by the antitrust division of the DOJ,[9] Reddy Ice share price fell to $4.40, down $2.05 from the prior day, and continued to fall the next day, closing at $3.43 per share on September 17, 2008. (CCAC ¶ 152, 163.) Plaintiffs allege in the CCAC that the share price has never recovered. The CCAC alleges that these share price declines were not mirrored by the market

_____

[9] Defendants argue that this press release does not imply that Mr. Key is associated with matters under investigation *by the DOJ.* The press release discusses Mr. Key's suspension for likely violating company policy and being associated with matters under investigation and in the next sentence discusses the DOJ investigation. Defendants put too fine an interpretation on this press release which is fairly understood to say that Mr. Key has likely violated company policy and is associated with matters under investigation by the antitrust division of the DOJ. The press release does not mention any other matters that "under investigation" and the Court finds that Plaintiffs' interpretation of this press release is not a "mischaracterization." (Defs.' Mot. Ex. L.)

in general and that in fact the Dow Jones Industrial Average and the S&P 500 declined only minimally on these same relevant dates. (CCAC ¶ 165.)

Defendants argue that by qualifying what is likely the most direct disclosure, i.e. the press release announcing Mr. Key's suspension for likely violating company policy, with the caveat that the matter is still under investigation and no conclusions have been reached regarding illegal conduct, the company somehow insulated this announcement from being considered as a corrective disclosure. However, as the court noted in *Freeland*, *supra,* "to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures." 233 F.R.D. at 47. Plaintiffs allege, and plausibly so, that the import of this disclosure is that the company suspended one of its top executives for likely doing exactly what the CCAC alleges Reddy Ice lied about, i.e. engaging in anticompetitive market behavior. That this announcement followed on the heels of the March 5, 2008 announcement of the DOJ investigation and the August 7, 2008 Wall Street Journal article disclosing Mr. McNulty's claims that Reddy Ice, Arctic Glacier and Home City engaged in a nationwide market allocation conspiracy, cannot be ignored. The market would not consider these statements in a vacuum and neither does the Court. The CCAC alleges that the market incorporated this information and recognized that the previously released statements about profits derived from a highly competitive industry and the company's statements professing market behavior strictly adhering to antitrust laws, were no longer reliable. On this recognition, the inflation dropped out of the price of Reddy Ice stock, the share price declined and the Plaintiffs suffered a materially significant economic loss. "A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation. '[A]s long as the misrepresentation is one substantial cause of

the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou,* 411 F.3d at 1025 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir.1997)) (emphasis omitted). The Court concludes that the CCAC adequately pleads loss causation.

E.      **Sufficiency of the Allegations as to Defendants Weaver and Booth.**

Defendant Weaver was at various times the Chief Operating Officer, the Chief Executive Officer and the President of Reddy Ice. Weaver signed and authorized registration statements, the prospectus issued in connection with the IPO, the company's 2005 and 2006 Form 10-Ks and Sarbanes-Oxley certifications. CW2 alleges first hand knowledge of Weaver's acknowledgment of the alleged market allocation scheme which was revealed at a meeting in Dallas, Texas in 2006 or 2007. (CCAC ¶¶ 51-52, 59.) Weaver, like Brick and Janusek, also engaged in insider sales and was also a participant in the executive compensation program. As discussed above with respect to Brick and Janusek, while none of these allegations standing alone may support a finding of scienter with respect to Weaver, collectively the CCAC adequately alleges that at the time he certified that the company was competing on price, quality and service in a highly competitive market and was cognizant of the illegality of market allocation agreements under the antitrust laws and attested that Reddy Ice was in full compliance with those laws, Weaver was aware of the alleged market allocation agreements with Arctic Glacier and Home City. The CCAC adequately alleges a material misrepresentation and scienter with respect to Defendant Weaver.

Defendant Booth presents a closer case. None of the confidential witnesses mentions Defendant Booth's knowledge of the alleged market allocation agreement. The Court cannot infer Booth's fraudulent intent merely from his position in the company. *Konkol*, 590 F.3d at 397. Nor

can the Court infer his knowledge or intent from his insider trades, which are not sufficiently alleged to have been "unusual" or "suspiciously timed." *Id*. at 399. Nor does the CCAC allege that Defendant Booth signed any corporate disclosure statements which would support Plaintiffs' claim that he made a material misrepresentation. Therefore, even were the Court to adopt the group pleading doctrine, it would not support a finding of scienter on the part of Defendant Booth. *See In re Cardinal Health*, 426 F. Supp. 2d at 744 (dismissing defendant who was a high level executive but was not alleged to have been involved in certifying corporate documents to the extent of the other defendants). Accordingly, the Court concludes that the CCAC does not adequately allege that Defendant Booth made a material misrepresentation or acted with scienter. Accordingly, the Court dismisses Plaintiffs' § 10(b) claim against Defendant Booth.

**F.      Section 20(a): Control Person Liability**

Plaintiffs also charge that the individual Defendants violated § 20(a) of the Exchange Act. Section 20(a) imposes derivative liability on defendants who "control" primary violators of securities laws. See 15 U.S.C. § 78t(a). A necessary element of a control person claim under § 20(a) is a primary violation of the securities laws. "Section 20(a) thus establishes two requirements for a finding of control person liability. First, the 'controlled person' must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the 'controlling person' defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation." *PR Diamonds*, 364 F.3d at 696.

In their motion to dismiss, Brick and Janusek have not challenged the sufficiency of the § 20(a) claim except to the extent that this claim depends on the existence of an underlying violation of § 10(b). Because the Court denies Brick and Janusek's motion to dismiss the § 10(b) claim, and

these Defendants offer no other argument in support of their motion to dismiss the § 20(a) claim, that claim remains viable against Defendants Brick and Janusek. Defendant Weaver does not address the § 20(a) claim at all in his individual motion to dismiss and therefore the § 20(a) claim also remains viable against him.

Plaintiffs argue that regardless of whether Defendant Booth is liable for a violation of § 10(b), he is still liable as a control person under § 20(a). Other than stating in their brief that the issue of whether a defendant is a controlling person under § 20(a) is generally a question of fact, Plaintiffs offer no argument in support of their contention that Defendant Booth "controlled" a primary violator. The Court, therefore, dismisses the § 20(a) claim against Defendant Booth.

## IV.     CONCLUSION

For the foregoing reasons, the Court DENIES Defendants Reddy Ice, Janusek and Brick's motion to dismiss (Dkt. Nos. 43, 78), DENIES Defendant Weaver's motion to dismiss (Dkt. No. 41) and GRANTS Defendant Booth's motion to dismiss (Dkt. No. 39). The Court further GRANTS Defendants Reddy Ice, Janusek and Brick's motion to supplement their pending motion to dismiss. (Dkt. No. 82.)

IT IS SO ORDERED.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 6, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 6, 2010.

S/Denise Goodine
Case Manager